[No. C000557. Third Dist. June 15, 1988.]

J. WILLIAM AMAREL et al., Plaintiffs and Appellants, v.
GROVER CONNELL et al., Defendants and Respondents.

**COUNSEL**

Morgan, Morgan, Towery, Morgan & Spector, W. Robert Morgan, Kevin Allmand, Carrico & Carrico, Pamela Fawn Carrico, Jack E. Carrico, Berger & Montague, David Berger, H. Laddie Montague, Jr., Howard Langer, Alan Sandals and Barry Kramer for Plaintiffs and Appellants.

Alioto & Alioto, Joseph L. Alioto, John I. Alioto, Mitchel Blumenthal and R. Michael Lieberman for Defendants and Respondents.

**OPINION**

**EVANS, J.**—Plaintiffs appeal from a judgment of dismissal after the trial court sustained, without leave to amend, defendants' demurrer to the second amended complaint. The question presented is whether causes of action asserted under state law for anticompetitive practices impermissibly intrude upon the federal domain in foreign relations and foreign commerce when the alleged unlawful practices incidentally involve trade with a foreign nation. We conclude they do not and shall reverse the judgment.

I

We begin with the settled principle that a demurrer challenges only the legal sufficiency of the complaint, not the truth or the accuracy of its factual allegations or the plaintiff's ability to prove those allegations. (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 922 [216 Cal.Rptr. 345, 702 P.2d 503]; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213-214 [197 Cal.Rptr. 783, 673 P.2d 660].) "In the construction of a pleading, for the purpose of determining its effect, its

allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.) We therefore treat as true all of the complaint's material factual allegations, including facts that may be implied or inferred from those expressly alleged. (*Kiseskey* v. *Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 228 [192 Cal.Rptr. 492].) We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Plaintiffs are independent California rice growers.[1] Defendants are various domestic individuals, agricultural cooperatives, and other entities engaged in the business of growing, milling, processing, marketing, and trading of California rice.[2] The relevant markets are those for California paddy rice, the milling of California paddy rice, and milled California rice. The defendant agricultural cooperatives participate in these markets by virtue of their vertically integrated operations. Because plaintiffs frequently sell paddy rice to mills under participation contracts giving plaintiffs a share in the profit from the sale of the milled rice, plaintiffs compete with the defendant cooperatives in these markets. By 1980, defendant cooperatives controlled over 75 percent of the California rice market, as well as almost all the port and storage facilities for shipping rice through the Port of Sacramento, the port closest to all California rice mills. Two independent rice mills—Pacific International Rice Mills, Inc. (PIRMI), in Woodland, and Comet Rice, Inc., in Maxwell—shared the remaining 25 percent of the milled rice market.

Plaintiffs' first cause of action alleges combinations and conspiracies among defendants in restraint of trade in violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.).[3] The defendants, in combination with

---

[1] They are: J. William Amarel; Jack E. Carrico; Pamela Fawn Carrico; Danley Bros., Inc., a corporation; Allen Etchepare; A. Charles Etcheverry; Jay Dee Garr; Johnson Equities, Inc., a corporation; C. Lambirth Farms, Inc., a corporation; J. H. McKnight Ranch, Inc., a corporation; Larry E. Middleton; Henry C. Moore; Reason Farms, a partnership; Rodrick Ranch, Inc., a corporation; Sohnrey Ranches, Inc., a corporation; Maxwell Spyres; Starkey Ranch, Inc., a corporation; and Yuba Farms Co., a corporation; and Morley Green, doing business as Nor-Cal Brokerage Co.

[2] They are: Grover Connell; Connell Rice and Sugar Co., a New Jersey corporation; Magnolia Trading and Shipping Company, a partnership; Magnolia Trading and Shipping Company, a corporation; James Robert Errecarte; Rice Growers Association of California, an agricultural cooperative corporation; Farmers Rice Cooperative, an agricultural cooperative corporation; and Joseph Alioto.

According to plaintiffs' brief, the defendant rice cooperatives, as well as James Errecarte, have settled plaintiffs' claims and are not, therefore, included among the respondents on appeal.

[3] All further statutory references are to the Business and Professions Code unless otherwise indicated.

one another, allegedly undertook to acquire independent rice mills through anticompetitive and predatory practices such as manipulation of market prices for California paddy and milled rice; boycotts and refusal to sell to purchasers of independently milled California rice; discriminatory pricing; and exclusion of independent mills from economically practicable port facilities. The ultimate purpose of these anticompetitive practices was to force plaintiff independent growers to join the agricultural cooperatives or to drive them and the independent mills out of the market. Using their monopoly power, defendants succeeded in destroying the California paddy rice market by driving down the prices; they succeeded in destroying one independent rice mill; and they succeeded in driving numerous independent growers from the market or to join the agricultural cooperatives. The effect has been to substantially restrain trade and commerce in the relevant markets; to severely limit the number of independent rice mills and purchasers of California paddy rice, restricting the ability of the independent growers to sell their rice and depriving them of full competition among purchasers of paddy rice; to severely restrain competition among sellers and marketing agents for milled California rice; to deny consumers the benefits of full and unrestricted competition; and to cause plaintiffs economic loss.

Plaintiffs' second cause of action is for violation of the Unfair Practices Act (§ 17000 et seq.) for below-cost sales (§ 17043) and collusion (§ 17048). Plaintiffs allege that the cooperatives, in collusion with the other defendants, sold paddy rice to defendant Connell Rice and Sugar at below cost, causing a depressed market for milled California rice, further causing plaintiffs to receive less than they otherwise would have received under their participation contracts with independent mills.

Plaintiffs' third cause of action incorporates the previous allegations and is for violation of the Unfair Practices Act for locality discrimination (§ 17040), secret rebates, refunds, commissions, or discounts tending to destroy competition (§ 17045), threats, intimidation, and boycotts to effect violation of the Unfair Practices Act (§ 17046), solicitation of violation of the act (§ 17047), and collusion (§ 17048).

Plaintiffs' fourth cause of action incorporates the previous allegations and is for violation of the Unfair Practices Act for below-cost sales and collusion. This cause of action specifically alleges defendant Connell's offer, in collusion with the other defendants, to sell milled California rice to the Office of Supply, Republic of Korea (OSROK), at below cost, causing a depressed market, to plaintiffs' injury.

Plaintiffs' fifth cause of action is for tortious interference with existing and potential business relationships. In 1981, PIRMI had entered into a

contract with OSROK for the sale of milled California rice. In response to OSROK's attempt to deal with independent California rice mills, and with the intent to cause breach of the PIRMI-OSROK contract, defendants supplied OSROK with false market information and incorrect statements of American law, as well as publicly accusing Korean officials of accepting bribes in connection with the contracts with independent California rice mills. Defendants' actions caused Korea to stop purchasing California rice after expiration of the PIRMI contracts in 1982. As a result of their participation contracts with independent California rice mills, plaintiffs thereafter received lower than expected prices on the 1981 and 1982 contracts with OSROK; they lost Korean sales that they had a legitimate expectation of receiving; and they received lower prices overall as a result of Korea's withdrawal from the California rice market.

Plaintiffs' sixth cause of action, in addition to incorporating all previous allegations of the complaint, is for unfair competition (§ 17200). Specifically, defendants are alleged to have knowingly and falsely represented to OSROK and the Republic of Korea the current prevailing market price for milled California rice; that defendants' competitors' contracts with OSROK were secured through payment of bribes; and that defendants' competitors and OSROK and the Republic of Korea were in violation of section 2(c) of the Robinson-Patman Act (15 U.S.C. § 13(c)). These misrepresentations were made for the purpose of injuring plaintiffs and, indeed, did injure plaintiffs in that they received less than a fair price on their contracts and lost the market for California rice in Korea.

Defendants interposed general and special demurrers to the complaint. The demurrers were sustained and the second amended complaint ordered dismissed without leave to amend. The court concluded that plaintiffs' causes of action were preempted by the Sherman Antitrust Act (15 U.S.C. §§ 1-7): "1. Plaintiff[s'] Second Amended Complaint, when read in light of plaintiffs' prior pleadings in this action, charges violations of the Cartwright Act and other California laws which alleged violations affect United States foreign commerce or United States foreign relations. [¶] 2. The Cartwright Act and other California laws are preempted by the federal antitrust laws in cases such as this which charge violations affecting United States foreign commerce or United States foreign relations. Therefore, plaintiffs' claims are not justiciable in California State Courts under California State laws and are dismissed for want of jurisdiction."

Judgment of dismissal was entered, and this appeal followed.

## II

Initially, we reject defendants' argument that the legal sufficiency of plaintiffs' second amended complaint must be determined by reference to

plaintiffs' original and first amended complaints. ▇ "The court on appeal will not consider the sufficiency of a superseded complaint where the plaintiff has amended it after demurrer sustained." (*Rolley, Inc.* v. *Merle Norman Cosmetics* (1954) 129 Cal.App.2d 844, 852 [278 P.2d 63]; *Hayter* v. *Fulmor* (1944) 66 Cal.App.2d 554, 562 [152 P.2d 746]; see *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 884 [92 Cal.Rptr. 162, 479 P.2d 362].) "An exception is recognized where there are allegations in the prior complaint destructive of the cause of action which are omitted in the subsequent pleading without a valid explanation." (*Terry* v. *Bender* (1956) 143 Cal.App.2d 198, 205 [300 P.2d 119].) The exception is reserved, however, for the extreme case, and it may not be indiscriminately applied; it "must be taken together with its purpose, which is to prevent amended pleading which is only a sham, when it is apparent that no cause of action can be stated truthfully." (*McGee* v. *McNally* (1981) 119 Cal.App.3d 891, 896-897 [174 Cal.Rptr. 253]; *Karp* v. *Dunn* (1964) 229 Cal.App.2d 186, 191 [40 Cal.Rptr. 93].)

▇ In this case, plaintiffs' prior first amended complaint contained four causes of action—one for violation of the Cartwright Act, one for violation of the Unfair Practices Act, one for unfair competition, and one for fraudulent interference with prospective business relations. The market in controversy was denominated "the production[,] buying, selling, milling and trading of California rice with a relevant submarket[ ] in the production, buying, selling, milling and trading of the California rice for export to the Republic of Korea." The alleged violations revolved about rice trade with the Republic of Korea, in particular the defendants' response to the entry into that market in the early 1980's of independent millers and marketers. Defendants were alleged to have engaged in a concerted campaign to drive the independents from that market. This campaign included communications and threats to Korean and United States government officials. Among the allegations were that "Defendants improperly and fraudulently exercised their political influence with United States congressmen and other United States government officials to pressure the Korean government, under the threat of reductions in credit and military assistance, to breach its contracts for the purchase of rice farmed by plaintiffs" and that "Defendants made specific threats to members of the State Department that they would upset United States relations with Korea unless government officials pressured Korea to contract with defendants." The trial court sustained defendants' demurrer to plaintiffs' first amended complaint on the ground it intruded into the exclusively federal sphere of foreign commerce and foreign relations. Leave to amend was granted, and plaintiffs' second amended complaint followed.

We perceive nothing devious or dishonest in the removal from the first three causes of action in plaintiffs' second amended complaint of the

offending language implicating foreign commerce and foreign relations with the Republic of Korea. In our view, the originally destructive allegations went only to the manner in which the alleged anticompetitive practices occurred. As such, the allegations were more in the nature of evidentiary facts and not facts essential to plaintiffs' stated causes of action. (See *Terry v. Bender, supra,* 143 Cal.App.2d at p. 205.) The trial court impliedly acknowledged this when it granted leave to amend so that plaintiffs could allege a sufficiently local nexus. Moreover, the allegations which could conceivably be read as intruding upon issues of United States foreign relations were alleged on information and belief. Plaintiffs were not, therefore, claiming any actual knowledge of those facts; the truth of those allegations would be peculiarly within the knowledge of defendants. (See *Karp v. Dunn, supra,* 229 Cal.App.2d at pp. 190-191.) In short, plaintiffs' second amended complaint does not carry with it "the onus of untruthfulness" (*Avalon Painting Co. v. Alert Lbr. Co.* (1965) 234 Cal.App.2d 178, 184 [44 Cal.Rptr. 90]), and the omission in it of the "offending" allegations does not impugn the credibility of the causes of action stated (see *McGee v. McNally, supra,* 119 Cal.App.3d at p. 897).

Liberally construed, plaintiffs' first three causes of action sufficiently allege violations of the Cartwright Act and the Unfair Practices Act. On the face of the pleading, issues of federal supremacy or preemption or preclusion are not implicated. At this stage of the proceedings, therefore, it was error for the trial court to sustain defendants' demurrer to plaintiffs' first three causes of action.

## III

Plaintiffs' fourth, fifth, and sixth causes of action allege anticompetitive conduct involving rice trade with the Republic of Korea. As to those causes of action, the question to be resolved is whether their prosecution impermissibly intrudes into the federal domain or is otherwise preempted or precluded by federal law.

The conduct of foreign affairs and international relations is an exclusively federal concern. "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." (*Hines v. Davidowitz* (1941) 312 U.S. 52, 63 [85 L.Ed. 581, 585, 61 S.Ct. 399] [registration of aliens].)

Thus, in Zschernig v. *Miller* (1968) 389 U.S. 429 [19 L.Ed.2d 683, 88 S.Ct. 664], the court struck down a state law that required inquiry "into the

type of governments that obtain in particular foreign nations" before citizens of those nations could receive property in the state through succession or testamentary disposition. (*Id.,* at pp. 432, 434 [19 L.Ed.2d at pp. 687, 688].) The law was "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." (*Id.,* at p. 432 [19 L.Ed.2d at p. 687].) The law had "more than 'some incidental or indirect effect in foreign countries,' and . . . great potential for disruption or embarrassment . . . ."; it had "a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems." (*Id.,* at pp. 434-435, 441 [19 L.Ed.2d at pp. 689, 692].) It made "unavoidable judicial criticism of nations established on a more authoritarian basis than our own." (*Id.,* at p. 440 [19 L.Ed.2d at p. 692].)

Similarly, the court in *Bethlehem Steel Corp.* v. *Board of Commissioners* (1969) 276 Cal.App.2d 221 [80 Cal.Rptr. 800], struck down the California Buy American Act as a "usurpation by this state of the power of the federal government to conduct foreign trade policy." (P. 225.) "Such state legislation may bear a particular onus to foreign nations since it may appear to be the product of selfish provincialism, rather than an instrument of justifiable policy. It is a type of protectionism which invites retaliative restrictions on our own trade." (P. 228.)

We find defendants' reliance on *Zschernig* and *Bethlehem Steel* to be misplaced. This is illustrated by *Estate of Horman* (1971) 5 Cal.3d 62 [95 Cal.Rptr. 433, 485 P.2d 785], a case involving application to an alien of a Probate Code section governing the time within which an interest to an estate must be claimed. The court distinguished *Zschernig* and *Bethlehem Steel*. The statute at issue in *Horman* "does not involve the state in any inquiry into foreign law, administration of foreign law, credibility of foreign governmental officials or any other matter condemned by *Zschernig*. All that is required by [the statute] is the computation of five years from the date of death of the decedent. The same time period applies to all nonresident aliens alike, regardless of their country of residence, its law or its policies. . . . [¶] [It] cannot be characterized as having a 'direct impact upon foreign relations,' nor is it likely to 'adversely affect the power of the central government to deal with' foreign relations. At most, its effect upon foreign relations is 'incidental or indirect,' and it does not unconstitutionally impinge upon the exclusive and plenary power of the federal government to deal with foreign affairs." (P. 80.)

Adhering to the principle gleaned from these decisions, we fail to discern how plaintiffs' causes of action, on the face of the complaint, intrude into the sphere of foreign relations. The laws under which the actions are being

prosecuted are neutral in their application to anticompetitive conduct in this state. The conduct at issue is purely commercial; the foreign relations aspect, if such exists at all, is, from the face of complaint, only incidental and indirect. Defendants' assertion that prosecution of these actions would involve prohibited inquiries into the acts and intentions of Korean and United States government officials in the area of foreign relations is not apparent at this stage of the proceedings. As a consequence, we conclude that plaintiffs' causes of action, as pleaded, are not precluded by federal dominance in the area of foreign relations.

■ "It is well established that within constitutional limits Congress may pre-empt state authority by so stating in express terms. [Citation.] Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be found from a ' "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," . . .' [Citations.] Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' [citation], or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]" (*Pacific Gas & Elec.* v. *Energy Resources Comm'n* (1983) 461 U.S. 190, 203-204 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713].)

■ It is obvious that federal and California laws prohibiting anticompetitive conduct share the same purpose and are complementary to one another. "Neither the Sherman Act nor the federal prohibition of undue burdens on interstate commerce (U.S. Const., art. I, § 8, cl. 3) prevents those state laws from reaching transactions that have interstate aspects but significantly affect state interests." (*Younger* v. *Jensen* (1980) 26 Cal.3d 397, 405 [161 Cal.Rptr. 905, 605 P.2d 813]; *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 51 [172 P.2d 867]; *R.E. Spriggs Co.* v. *Adolph Coors Co.* (1974) 37 Cal.App.3d 653, 659 [112 Cal.Rptr. 585]; *Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542* (1958) 163 Cal.App.2d 771, 787-788 [330 P.2d 53]; see also *People* v. *Gordon* (1951) 105 Cal.App.2d 711, 718-719 [234 P.2d 287] [California's Unfair Practices Act not preempted by Sherman Antitrust Act].)

Federal and California law do not necessarily fall into disharmony when the conduct in question involves foreign commerce rather than interstate commerce. "The history of the Sherman Antitrust Act makes it clear that the Congress did not intend that the federal legislation preempt parallel state efforts to control unfair competitive practices. Before the enactment of the Sherman Act, some 21 states had legislation proscribing 'combinations

in restraint of trade.' Thus, it was not by accident that Congress did not use language in its act that would expressly preclude state regulation though the activity possessed interstate qualities. Senator Sherman, in urging enactment of his bill, stated: 'This bill . . . has for its . . . object to invoke the aid of the courts of the United States to deal with the combinations . . . when they affect injuriously our *foreign* and interstate commerce . . . and in this way to *supplement* the enforcement of the established rules of the common and statute laws by the several states in dealing with combinations that affect injuriously the industrial liberty of the citizens of those states. It is to arm the federal courts within the limit of their constitutional power *that they may cooperate with the state courts* in checking, curbing and controlling the most dangerous combinations that now threaten the business, property, and trade of the people of the United States. . . .' (21 Cong. Rec. 2457 (1890).)" (*R.E. Spriggs Co.* v. *Adolph Coors Co., supra,* 37 Cal.App.3d at p. 660, original and added italics, fn. omitted.) This statement of objective makes no distinction between foreign and interstate commerce, and it contemplates a cooperative federalism in curbing anticompetitive practices in both arenas.

Defendants cite the Export Trading Company Act of 1982 (15 U.S.C. § 4001 et seq.) and the Foreign Trade Antitrust Improvement Act of 1982 (15 U.S.C. § 6a) as evidencing congressional intent to fully occupy the field of foreign commerce. We disagree.

The Export Trading Company Act of 1982 is designed to "promote and encourage export trade" through issuance by the Secretary of Commerce of "certificates of review." (15 U.S.C. § 4011.) "A certificate of review shall be issued to any applicant that establishes that its specified export trade, export trade activities, and methods of operation will—[¶] (1) result in neither a substantial lessening of competition or restraint of trade within the United States nor a substantial restraint of the export trade of any competitor of the applicant, [¶] (2) not unreasonably enhance, stabilize, or depress prices within the United States of the goods, wares, merchandise, or services of the class exported by the applicant, [¶] (3) not constitute unfair methods of competition against competitors engaged in the export of goods, wares, merchandise, or services of the class exported by the applicant, and [¶] (4) not include any act that may reasonably be expected to result in the sale for consumption or resale within the United States of the goods, wares, merchandise, or services exported by the applicant." (15 U.S.C. § 4013(a).) With an exception not applicable here, "no criminal or civil action may be brought under the antitrust laws against a person to whom a certificate of review is issued which is based on conduct which is specified in, and complies with the terms of, a certificate issued under section 4013 of this title which certificate was in effect when the conduct occurred." (15 U.S.C.

§ 4016(a).) The term "antitrust laws" includes "any State antitrust or unfair competition law." (15 U.S.C. 4002(a)(7).) Thus, the Export Trading Company Act clearly contemplates the continued enforcement of state law in this area in the absence of a defendant's having been issued a certificate of review. At most, the issuance of such a certificate would constitute an affirmative defense to an action under state law.

The Foreign Trade Antitrust Improvement Act of 1982 amended the Sherman Act by adding the following section: "Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—[¶] (1) such conduct has a direct, substantial, and reasonably foreseeable effect—[¶] (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or [¶] (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and [¶] (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section. [¶] If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States." (15 U.S.C. § 6a.) The legislative history of this act discloses it was intended to establish a uniform standard, in the face of conflicting judicial formulations, of the domestic effects necessary to trigger the jurisdiction of American antitrust laws. (See H.R.Rep. No. 97-686, pp. 5-6, 8-9 (1982), reprinted in 1982 U.S. Code Cong. & Admin. News, at pp. 2490-2491, 2493-2494.) "[T]he bill is not intended to restrict the application of American laws to extraterritorial conduct where the requisite effects exist or to the extraterritorial pursuit of evidence in appropriate cases." (H.R.Rep. No. 97-686, p. 13, reprinted in 1982 U.S. Code Cong. & Admin. News, at p. 2498.) Absent a clear expression to the contrary, it must be presumed Congress did not intend to displace state law. (See *Maryland* v. *Louisiana* (1981) 451 U.S. 725, 746 [68 L.Ed.2d 576, 595, 101 S.Ct. 2114].) "[W]here, as in the case of antitrust regulation, Congress has not expressed its intent to preempt state authority, the proper approach to a preemption analysis is to reconcile 'the operation of both statutory schemes with one another rather than holding one completely ousted.' [Citations.]" (*Crown Oil Corp.* v. *Superior Court* (1986) 177 Cal.App.3d 604, 610-611 [223 Cal.Rptr. 164].) Thus, the most the Foreign Trade Antitrust Improvement Act does to state law is to establish an "effects" test for application of the state's antitrust and unfair competition laws to export activity. And the nature of the test—"direct, substantial, and reasonably foreseeable effect"—does not lend itself to disposition on demurrer.

We conclude, therefore, that plaintiffs' state law causes of action alleging anticompetitive practices by defendants, which practices involved export trade but are alleged to have had an adverse effect on the relevant markets in this state, are not preempted by the Sherman Antitrust Act.

Additionally, we do not subscribe to the notion that the negative implications of the commerce clause preclude plaintiffs' causes of action. Article I, section 8, clause 3 of the United States Constitution provides that Congress shall have the power "To regulate commerce with foreign nations, and among the several States . . . ." "The restriction implicit in the Commerce Clause is designed to prohibit States from burdening the free flow of commerce, . . ." (*Massachusetts* v. *United States* (1978) 435 U.S. 444, 462 [55 L.Ed.2d 403, 417, 98 S.Ct. 1153].) "Although [the commerce clause] grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." (Fn. omitted, *Japan Line, Ltd.* v. *County of Los Angeles* (1979) 441 U.S. 434, 448 [60 L.Ed.2d 336, 347-348, 99 S.Ct. 1813]; see also *Reeves, Inc.* v. *Stake* (1980) 447 U.S. 429, 437, fn. 9 [65 L.Ed.2d 244, 252, 100 S.Ct. 2271] ["Commerce Clause scrutiny may well be more rigorous when a restraint on foreign commerce is alleged."].)

The predicate, of course, for "negative" commerce clause analysis, or federal preclusion as it were, is congressional silence on the subject matter of the state law at issue. As is demonstrated, however, Congress has been all but silent on the subject matter of antitrust and unfair competition. Moreover, it is established that federal and state antitrust and unfair competition laws may coexist when in harmony. The only question is whether Congress has, in this area, evidenced a clear intent to preempt state law affecting foreign, as opposed to interstate, commerce. That question we have answered negatively. So long as the anticompetitive conduct in question has a direct, substantial and reasonably foreseeable effect within the state, prosecution of the conduct under state law is not precluded.

The judgment of dismissal is reversed.

Puglia, P. J., and Deegan, J.,* concurred.

---

* Assigned by the Chairperson of Judicial Council.