[No. C002975. Third Dist. Apr. 17, 1990.]

TURNBULL & TURNBULL, Plaintiff and Respondent, v.
ARA TRANSPORTATION, INC., Defendant and Appellant.

[Opinion certified for partial publication.[1]]

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III through VIII and IX-B and IX-C.

812

**COUNSEL**

Alan D. Croll, Eve Triffo, Wyman, Bautzer, Kuchel & Silbert, James T. Freeman, Charity Kenyon, Diepenbrock, Wulff, Plant & Hannegan for Defendant and Appellant.

William A. Schuckman for Plaintiff and Respondent.

**OPINION**

**MARLER, J.**—Defendant ARA Transportation, Inc. (ARA), appeals from a judgment entered after a jury found ARA had sold its bus transportation services at below its cost of providing the services with the purpose of injuring competitors or destroying competition in violation of Business and Professions Code section 17043 (hereafter all undesignated section references are to this code). The jury awarded plaintiff Turnbull & Turnbull, doing business as Sullivan & Co. (Sullivan), $259,568 in compensatory damages and $1 million in punitive damages.

On appeal, ARA contends the judgment should be reversed because California's below cost sales statute is unconstitutional and preempted by federal law and because there is no substantial evidence that ARA sold its services below cost. ARA also contends there is no substantial evidence it had the requisite intent to injure competitors and that it was prejudiced by instructional error and by the erroneous admission of certain evidence. In addition, it alleges juror misconduct prevented ARA from having a fair trial. Finally, ARA raises various challenges to the compensatory and punitive damages awards. We shall reverse the judgment and remand the matter for a new trial limited to the issue of damages.

### FACTUAL AND PROCEDURAL BACKGROUND

Sullivan and ARA were providers of bus transportation services and had been competitors for several San Joaquin County Office of Education contracts for the transportation of handicapped school children. Every year the San Joaquin County Superintendent of Schools provided bid specifications which indicated the estimated number of children that were to be transported and their addresses. From this information bus contractors interested in bidding on the contract could calculate the mileage and costs involved in transporting the students and submit their bids accordingly. During the 1978-1979, 1979-1980, 1980-1981, and 1981-1982 school years, ARA was awarded the contracts.

On July 13, 1982, Sullivan filed its first amended complaint against ARA alleging ARA sold its bus transportation services below cost in violation of section 17043.[2] Sullivan alleged it was injured in that it was deprived of being awarded the transportation contracts as a proximate result of ARA's conduct. Sullivan sought compensatory and punitive damages and treble damages pursuant to section 17082.[3]

The court ruled Sullivan's claim based on the 1978-1979 contract was barred by the statute of limitations. Relying on *G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256, 277-279 [195 Cal.Rptr. 211, 41 A.L.R.4th 653], it also ruled a one-year statute of limitation applied to the award of treble dam-

---

[2] Section 17043 provides: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."

Section 17024 provides: " 'Article or product' includes any article, product, commodity, thing of value, service or output of a service trade."

[3] Section 17082 provides in pertinent part: "In any action under this chapter, it is not necessary to allege or prove actual damages or the threat thereof, or actual injury or the threat thereof to the plaintiff. But, in addition to injunctive relief, any plaintiff in any such action shall be entitled to recover three times the amount of the actual damages, if any, sustained by the plaintiff, . . ."

ages, precluding such an award except for the 1981-1982 contract year. In addition, the court determined Sullivan was not entitled to both treble damages and punitive damages and would therefore be permitted to make a post verdict election of remedies. It was also decided the jury would not be apprised of Sullivan's entitlement to treble damages and that the trebling would be performed by the court if Sullivan opted not to receive punitive damages.

At trial, John Bahnsen, the deputy superintendent of schools of San Joaquin County, testified that ARA and Sullivan provided services of equivalent quality, but ARA was awarded the contracts in question because it was the lowest bidder.

George Grundig, an economist specializing in transportation economics and transportation analysis, testified that in his opinion ARA had submitted bids that were lower than its cost of providing the contract services. Grundig used four different methods in calculating whether ARA's bid was below its costs. The first method involved comparing the revenue per mile received by ARA on the San Joaquin County contract with the revenue per mile it received on other bus transportation contracts in other counties, after having made adjustments for cost differentials between the counties. The second method compared the revenue per mile ARA received on the San Joaquin County contract with the revenue per mile it received on its Delta College contract in San Joaquin County. In the third method, Grundig calculated ARA's costs based on two national cost surveys regarding operating costs of private passenger vans. Grundig's fourth method entailed an analysis of ARA's operating statements and an allocation of ARA's operating expenses per mile traveled. ARA's total operating costs for the year were divided by the total miles traveled to yield an average cost per mile. This figure was then multiplied by the contract mileage to determine the contract cost. In each year in question, ARA's bid was below its costs of providing the contract services. Katherine Porter, who had a degree in mathematics and worked primarily as an investment adviser and financial planner, assisted Grundig in calculating both ARA's costs and Sullivan's damages.

Based on the limited information provided to Sullivan by ARA, Grundig was unable to calculate more accurately ARA's costs of providing the contract services. In response to interrogatories from Sullivan requesting the amount of overhead and administrative expenses and the amount of net profit or loss on each contract, ARA stated it did not maintain records which allocated overhead expenses and profits on a per contract basis. Some ARA witnesses verified that ARA did not have any documents allocating its costs per contract. However, according to Robert Griffiths, who had

been ARA's area controller, initially documents were kept which would enable ARA to determine the cost of each contract, but once the level one operating statements were prepared at the end of each year, these documents were routinely destroyed. Griffiths testified it was not possible to re-create this documentation, although it could have been generated several years ago when the contracts were in effect. Griffiths stated he was unaware that on March 16, 1982, prior to the expiration of the 1981-1982 contract, Sullivan's counsel had written Merle Jewett, ARA's director of marketing, advising Jewett that litigation would ensue if documentation was not voluntarily provided demonstrating that ARA's bid on the 1981-1982 contract was above its costs. When ARA refused to supply the requested information, Sullivan advised ARA's general counsel in April 1982 that it would pursue litigation and Sullivan subsequently served ARA with its first amended complaint on July 20, 1982.

Augustine Zemba, who had been ARA's executive vice-president of the transportation group until mid-1977, testified concerning ARA's policy of bidding below cost. Zemba oversaw operations, assisted in the bidding process and worked at the policy-setting level with ARA. His office was located at the group headquarters in Encino. Apparently the transportation group was comprised of approximately five regions or areas and each area had several divisions. ARA's Stockton operation was part of a division that belonged to the central area. All of the Stockton operation's bids were approved by the Encino office prior to being submitted to the parties seeking transportation service bids.

According to Zemba, ARA's overall policy was to penetrate the market and where there was existing competition, it would bid at any cost, even below cost, a process known as "low-balling." Other ARA personnel involved in this policy were Mel Sherman, who was the president of the transportation group, Bill Seegel, who was president of ARA's food services and executive vice-president of ARA Services, Inc., and Livingston Kosborg, who was senior vice-president of ARA Services, Inc. Zemba became aware of ARA's below cost bidding policy approximately one year after he joined the corporation in 1972. At a transportation group meeting, attended by Sherman, Kosborg, and Zemba, Kosborg announced his objective was for ARA to become the largest transportation company and show tremendous growth in specific areas including Northern California. Kosborg stated ARA would bid below cost, secure contracts and eliminate the competition. After that meeting, below cost bids were submitted to various school districts by ARA.

Zemba explained the process that was used in bidding below cost. He stated that true cost figures, submitted by the bidding division to the group

transportation office for approval would simply be reduced so that it appeared the bid was above cost. The loss would be reallocated to some other profit-making division of ARA. This also served to reduce the amount of profit ARA appeared to make on other school district contracts to which the costs had been reallocated. After showing the school district altered documents reflecting its small profit, ARA would be able to justify an increase in its bids when it came time to renew these contracts. Lower level management was unaware that these changes and reallocations were being made as they did not receive complete financial reports. Zemba used to have many documents reflecting these alterations, but he returned them to ARA after he left the corporation in 1977.

Zemba testified he left ARA because he was concerned that Kosborg would conveniently forget he had endorsed the below cost bidding policy and Zemba would be held responsible. He was also embarrassed by being repeatedly put in the awkward position of approaching the school district and asking for more money, using the excuse that a mistake had been made in preparing the bid. He had been asked to do this several times and had been successful in obtaining the necessary increases.

Based upon information Zemba received after his departure from ARA and upon his 30 years of experience as an executive at the policy-making level of large private corporations and government organizations, he believed ARA's "low-balling" was continuing as a matter of practice as corporate policy is slow to change. In May 1978, Zemba met with Marvin Heaps and Frank Pfizenmayer, the president and general counsel of ARA Services, Inc., and discussed, among other things, ARA's low-ball bidding practices. Zemba stated one purpose of the meeting was to ask him to be quiet as there was other litigation going on throughout the country and publicity throughout the news media. According to Zemba, Heaps asked him to "lay off" and stated he knew there was low-ball bidding going on. Zemba remembered that after the meeting, Heaps sent him a letter thanking him and stating something to the effect that Heaps knew he had "a lot of mud to clean up."

Heaps and Pfizenmayer admitted that the meeting took place, but denied that Heaps made any statements concerning ARA's bidding practices. A portion of the letter Heaps sent to Zemba was introduced and it stated: "I appreciate your sharing your views on so many subjects. Please be assured I take this matter seriously and continue to be desirous that ARA and all of its components operates [sic] in a completely ethical way." There was nothing specifically about cleaning up mud.

Charles Gross, ARA's chief financial officer between 1975 and 1979, testified that ARA was concerned with making a profit on each contract

and would not bid under cost. Jack Gottsman, the president of ARA's transportation group, testified ARA's overall policy was to bid "a profitable business so that we could grow competitively. . . ." ARA was concerned that each contract make a profit and bids were reviewed to make sure ARA was going into a contract on a profitable basis.

Robert Griffiths, the area controller who was in charge of the bidding process between 1979 and 1982, testified concerning ARA's method of allocating costs. It appears that variable costs were allocated per bus, per day. Fixed or overhead costs were allocated on the basis of bus days and revenue generated by each contract. The overhead would first be allocated among the various divisions based on the number of bus days generated by each division. Then each division would allocate the overhead per contract in proportion to the percentage of revenue generated by each contract. According to Griffiths, the San Joaquin County bids covered ARA's costs and generated a profit. ARA provided no testimony or documentation concerning the *amount* of either its actual or projected costs of providing the San Joaquin County contract services.

The jury awarded Sullivan compensatory and punitive damages for the contract years 1979-1980 and 1981-1982 and nothing for 1980-1981. Sullivan elected to receive the compensatory and punitive damages award instead of treble damages. After ARA unsuccessfully moved for a new trial or a judgment notwithstanding the verdict, it timely filed a notice of appeal.

DISCUSSION

I

ARA contends the Unfair Practices Act (§ 17000 et seq.) violates the due process clauses of the California and United States Constitutions because the method for determining whether a service is sold below cost is arbitrary and irrational. In addressing ARA's due process argument a court may question the wisdom of a statute, but "the Due Process Clause does not empower the judiciary 'to sit as a "superlegislature to weigh the wisdom of legislation" . . . .' [Citation.]" (*Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117, 124 [57 L.Ed.2d 91, 99, 98 S.Ct. 2207].)

As sections 17026[4] and 17029[5] define cost to include all variable and fixed costs, it appears the Unfair Practices Act employs a fully allocated

---

[4]Section 17026 provides in pertinent part: " 'Cost' as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer. [¶] 'Cost' as applied to distribution means the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor, plus the cost of doing business by the distributor and

cost or fully distributed cost standard to determine whether a sale has violated section 17043. (*G.H.I.I.* v. *MTS, Inc., supra,* 147 Cal.App.3d at p. 275; *William Inglis, etc.* v. *ITT Continental Baking Co.* (9th Cir. 1981) 668 F.2d 1014, 1048.) ■ Variable costs are costs that vary with changes in output, while fixed costs are those that do not vary with changes in output. (Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act* (1975) 88 Harv.L.Rev. 697, 700.) ■ The concept of fully allocated cost has been equated with average total cost, which "reflects that portion of the firm's total costs—both fixed and variable—attributable on an average basis to each unit of output." (*William Inglis, supra,* 668 F.2d at p. 1035, fn. 30, 1048; but see *MCI Communications* v. *American Tel. & Tel. Co.* (7th Cir. 1983) 708 F.2d 1081, 1122.)

The Legislature has declared the purpose of the Unfair Practices Act "is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." (§ 17001.) Although the California Supreme Court has determined the purpose and policy of the Legislature in enacting the Unfair Practices Act and the means employed to subserve the legislative purpose by prohibiting sales below costs made with intent to injure competitors or competition is a valid exercise of the police power (*Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634 [82 P.2d 3, 118 A.L.R. 486]), it has not directly addressed the issue of whether the act's method of cost allocation is constitutional. (*Id.,* at p. 662; *People* v. *Pay Less Drug Store* (1944) 25 Cal.2d 108, 118 [153 P.2d 9].) ■ The court did note, however, that any difficulty in computing costs is a factual one, and statutes are not to be declared invalid because in their application factual difficulties may arise. (*Pay Less Drug Store, supra,* at p. 118.)

■ ARA points out that some authorities question the use of the fully allocated cost method or average total cost method in determining the costs below which a business may not sell its goods or services for federal antitrust law purposes and instead propose the use of the average variable cost or long-run incremental cost method. (*MCI Communications* v. *American*

vendor and in the absence of proof of cost of doing business a markup of 6 percent on such invoice or replacement cost shall be prima facie proof of such cost of doing business. [¶] 'Cost' as applied to warranty service agreements includes the cost of parts, transporting the parts, labor, and all overhead expenses of the service agency."

[5] Section 17029 provides: " 'Cost of doing business' or 'overhead expense' means all costs of doing business incurred in the conduct of the business and shall include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

*Tel. & Tel. Co., supra,* 708 F.2d at pp. 1119-1122 and cases cited therein; *Areeda & Turner, op. cit. supra,* 88 Harv.L.Rev. at pp. 716-718, 732-733.) Average variable cost is the sum of all variable costs divided by output. (*Areeda and Turner, op. cit. supra,* at p. 700.) Long-run incremental cost measures all of the fixed and variable costs of adding a new product or service but, unlike fully allocated cost, only measures such costs which are causally related to the service or product in question. (*MCI, supra,* 708 F.2d at pp. 1115, 1122.)

The Seventh Circuit has stated that the fully distributed cost (FDC) method, which is one method of calculating average total cost, "is a quite arbitrary allocation of costs among different classes of service. There are countless FDC methods, each allocating costs by a different mathematical formula.[] Despite trenchant criticism on economic grounds,[] FDC continues to be widely used for regulatory purposes, *inter alia,* because of its ease of application in dividing an authorized total revenue requirement among individual products or services—much as a pie is divided into slices. But FDC cannot purport to identify those costs which are *caused* by a product or service, and this is fundamental to economic cost determination." (*MCI Communications* v. *American Tel. & Tel. Co., supra,* 708 F.2d at p. 1116, fns. omitted, italics original.) The court also noted various FDC methods would normally produce quite different calculations of the cost of a product or service and set forth a simple example to highlight what it termed the arbitrariness of FDC methodology. It stated: "Imagine a railroad line that simultaneously transports three different products: gold, lead and feathers. If the railroad attempted to calculate, on a fully distributed cost basis, the cost of shipping each of these products, it would reach radically different results depending on whether it allocated joint and common costs on the basis of the value, weight, or bulk of the respective commodities shipped." (*Id.,* at p. 1116, fn. 48.)

The Sixth and Ninth Circuits have not adopted any particular cost method, but have instead held that whatever method is used only affects the burden of proof. If the plaintiff establishes the defendant sold its product below its average total cost but above its average variable cost, then the plaintiff has the burden of proving defendant did so with a predatory intent. If the plaintiff establishes the defendant sold its product below its average variable cost, then the defendant has the burden of negating that it had a predatory intent. (*William Inglis, etc.* v. *ITT Continental Baking Co., supra,* 668 F.2d at pp. 1035-1036; accord *Arthur S. Langenderfer, Inc.* v. *S.E. Johnson Co.* (6th Cir. 1984) 729 F.2d 1050, 1056.) The Ninth Circuit has stated the opinion that prices exceeding average total cost may be considered predatory where the plaintiff provides clear and convincing evidence of the defendant's predatory intent. (*Transamerica Computer Co., Inc.* v. *IBM*

*Corp.* (9th Cir. 1983) 698 F.2d 1377, 1387-1388.) These cases demonstrate there has been no consensus in the federal courts regarding which measure of cost should be used in determining whether a business has engaged in predatory below-cost-pricing in a federal antitrust context. (*Cargill, Inc.* v. *Monfort of Colorado, Inc.* (1986) 479 U.S. 104, 117, fn. 12 [93 L.Ed.2d 427, 440, 107 S.Ct. 484].)

We find the use of the fully allocated cost method, when viewed in conjunction with the injurious intent requirement of section 17043, is rationally related to the valid legislative purpose enunciated in section 17001 as it assists in preventing the creation or perpetuation of monopolies. For example, assume that a large multiproduct company that uses the average variable cost method is in competition with a small single-product company which manufactures widgets (a product familiar to all lawyers and law students). The multiproduct company could allocate major indirect or fixed costs disproportionately to its nonwidget products and allocate little or nothing except variable costs to its widgets. In contrast, the single-product competitor's total fixed and variable costs must of necessity be allocated among its widgets. Accordingly, the multiproduct competitor could claim its cost of manufacturing widgets was far below that of the single-product competitor and set its prices at a level that would technically be above its costs and profitable, yet be damaging to competition. Because the single-product competitor could not meet the multiproduct competitor's artificially low prices, it might be driven from the marketplace, leaving the multiproduct competitor with a monopoly on the sale of widgets. The multiproduct competitor could then dramatically increase widget prices, disproportionately allocate its fixed costs to widgets, and by using the same variable cost method attack some other competitor's product line or market with unrealistically low prices. The fully allocated cost method, although not perfect, prevents this method of monopolization by requiring that a pro rata portion of the multi product competitor's overhead and fixed costs be included in its widget cost figures.

ARA claims the fully allocated cost method is arbitrary because there are many ways of allocating costs (for example, in the present case per mile, per bus or per student) each of which may result in significantly different cost profiles. While we agree there are many ways of fully allocating costs, the possibilities are not without limitation. To be legally acceptable, the allocation of indirect or fixed overhead costs to a particular product or service must be reasonably related to the burden such product or service imposes on the overall cost of doing business. (*William Inglis & Sons Bak. Co.* v. *ITT Con. Bak. Co., Inc.* (N.D.Cal. 1975) 389 F.Supp. 1334, 1344, reversed on other grounds in *Wm. Inglis & Sons Baking* v. *ITT Cont. Baking Co.* (9th Cir. 1975) 526 F.2d 86, 88.) Moreover, a defendant is free to demon-

strate to the trier of fact that its fully allocated cost, using another reasonable allocation method other than that used by the plaintiff, is actually lower than the plaintiff alleges and lower than defendant's sales or bid price. (See McCarthy, *Whatever Happened to the Small Businessman? The California Unfair Practices Act* (1968) 2 U.S.F. L.Rev. 165, 179-180.) ARA did not do so. It merely presented witnesses who testified ARA always bid above cost or always sought to make a profit. In fact, ARA did not even demonstrate it sold its services above its average variable cost or long-run incremental cost, the methods it espouses. As such, defendant failed to demonstrate that the use of the fully allocated cost method was arbitrary or irrational as applied to the facts of this case.

ARA's attack on the use of the fully allocated cost method is, in effect, nothing more than a challenge to the economic wisdom of the statute, a matter more properly addressed to the Legislature. Since we have concluded the use of the fully allocated cost method is rationally related to a valid legislative purpose, we must reject ARA's due process claim. (*Exxon Corp.* v. *Governor of Maryland, supra,* 437 U.S., at pp. 124-125 [57 L.Ed.2d at p. 99]; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 547 [63 Cal.Rptr. 21, 432 P.2d 717].)

## II

ARA contends California's use of the fully allocated cost method in section 17043 may be interpreted as economic regulation intended to protect smaller or less efficient competitors from competition. (See *MCI Communications* v. *American Tel. & Tel. Co., supra,* 708 F.2d at p. 1117.) As such it is preempted by the Sherman Antitrust Act (15 U.S.C. § 1 et seq.) because it prohibits procompetitive conduct that is not injurious to competition.[6]

"It is well established that within contitutional limits Congress may pre-empt state authority by so stating in express terms. [Citation.] Absent exclusive pre-emptive language, Congress' intent to supersede state law altogether may be found from a ' "scheme of federal regulation . . . so

---

[6]The Sherman Antitrust Act provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ." (15 U.S.C. § 1.)

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, . . ." (15 U.S.C. § 2.)

Generally, the Sherman Act bans all arrangements that are adopted to reduce competition or which have a significant tendency to reduce competition. (*Northrop Corp.* v. *McDonnell Douglas Corp.* (9th Cir. 1983) 705 F.2d 1030, 1050.)

pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,". . .' [Citations.] Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' [citation], or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]" (*Pacific Gas & Elec.* v. *Energy Resources Comm'n.* (1983) 461 U.S. 190, 203-204 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713].)

■ " 'The history of the Sherman Antitrust Act makes it clear that the Congress did not intend that the federal legislation preempt parallel state efforts to control unfair competitive practices.' . . . [Citations.]" (*Amarel* v. *Connell* (1988) 202 Cal.App.3d 137, 147 [248 Cal.Rptr. 276].) ■ Therefore we need only decide whether the Unfair Practices Act actually conflicts with federal law.

ARA argues the Unfair Practices Act conflicts with the Sherman Act because it could be interpreted as anticompetitive, as the fully allocated cost method protects smaller or less efficient competitors from competition. Furthermore, it conflicts with federal law because it makes rational, profitable and nonpredatory pricing above long-run incremental cost presumptively unlawful.

A similar argument was raised by the defendant in *William Inglis, etc.* v. *ITT Continental Baking Co., supra,* 668 F.2d 1014. Continental contended that California's fully allocated cost standard conflicted with the Ninth Circuit's interpretation of federal antitrust laws, which permitted pricing, under appropriate circumstances, at or above marginal or average variable cost. It argued that the California law proscribed conduct which federal law permitted and thereby frustrated the fundamental policies of the Sherman Act. (*Id.,* at pp. 1048-1049.)

The Ninth Circuit held that the possibility of proscription by California of conduct that federal law might permit was not sufficient to warrant preemption. (668 F.2d at p. 1049.) The fact that federal law had established an evidentiary standard, which did not make all pricing below average total cost indicative of anticompetitive intent, did not create a federal right to set such prices. (*Id.,* at p. 1049.) The court noted the cost method used by California's statute essentially proscribed pricing below average total cost. (*Id.,* at p. 1048.) The statute did not make all sales below average total cost illegal per se, but only such sales that had been made for the purpose of injuring competitors or destroying competition. The court found the only real difference between the California statute and federal law was in the

allocation of evidentiary burdens, as follows: "Assuming proof of injury to a competitor has been made, California law allows plaintiffs to establish a prima facie case with proof of prices below average total cost. The defendant then has the burden of negating the inference of illegal intent or establishing an affirmative defense. Under federal law, the plaintiff who relies on prices below average total cost, but above average variable cost, has not created a presumption of illegal intent. To establish such a presumption he must show that no legitimate business reason for the below-cost price exists. It follows, therefore, that a price below average total cost but above average variable cost does not always violate California law, nor is such a price a guarantee of immunity under federal law. The difference between the two laws does not warrant the inference of preemption." (668 F.2d at pp. 1049-1050.)

ARA disagrees with the statement in *William Inglis* that the Unfair Practices Act essentially proscribes pricing below average total cost and relies on the Seventh Circuit decision in *MCI Communications, supra,* 708 F.2d 1081 to support its position. The *MCI Communications* court noted that average total cost should not be equated with fully distributed cost and that it is best measured by average long-run incremental cost. (*MCI Communications, supra,* at p. 1122.) It also noted that some federal circuits had rejected the use of the fully allocated cost method and endorsed a marginal cost method. (*Id.,* at pp. 1120-1122.) ▆ We need not resolve or harmonize this apparent conflict among the federal circuits, however, as we are not bound by their decisions. (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764-765 [336 P.2d 521], revd. without comment on this point, 362 U.S. 628 [4 L.Ed.2d 1002, 80 S.Ct. 1050]; accord *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 830 [171 Cal.Rptr. 604, 623 P.2d 165].) ▆ Absent a determination by the United States Supreme Court regarding what formula or cost method should be used in determining whether pricing is predatory, there is no clear federal standard with which the Unfair Practices Act may be said to conflict.

In any event, even if, as ARA contends, the Unfair Practices Act may hypothetically have an anticompetitive effect, this does not warrant an inference of preemption. "For if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed.[1]" (*Exxon Corp.* v. *Governor of Maryland, supra,* 437 U.S. at p. 133 [57 L.Ed.2d at p. 105].) The mere fact that the Unfair Practices Act proscribes conduct that might, according to some federal courts, be permitted under federal law is insufficient to demonstrate that the Unfair Practices Act is preempted by the Sherman Act. (*Id.,* at p. 130-131 [57 L.Ed.2d at p. 103].)

As previously discussed, the use of the fully allocated cost method is rationally related to the Unfair Practices Act's legitimate purpose of safeguarding the public against the creation or perpetuation of monopolies and of fostering and encouraging competition. This purpose is basically the same as that of the Sherman Act. (See fn. 6, *ante*; *William Inglis, etc.* v. *ITT Continental Baking Co., supra,* 668 F.2d at p. 1050, fn. 62.) ■ An inference of preemption is not appropriate where the basic purposes of the state and federal statutes are similar. (*Exxon Corp., supra,* 437 U.S. at pp. 132-133 [57 L.Ed.2d at p. 104].)

On the facts of this case, ARA has not shown there is any conflict between the Sherman Act and the Unfair Practices Act. Under the circumstances, we find no preemption. (See also *People* v. *Gordon* (1951) 105 Cal.App.2d 711, 718-719 [234 P.2d 287].)

## III-VIII*

. . . . . . . . . . . . . . . . . . .

## IX

### A.

■ ARA also challenges the award of punitive damages arguing Sullivan was not entitled to an election of remedies as it was limited to the treble damages provided for in section 17082. We agree.

■ Where a statutory penalty is imposed for a wrongful act, it does not preclude recovery of punitive damages in a tort action where the necessary malice or oppression is shown. (*Greenberg* v. *Western Turf Assn.* (1903) 140 Cal. 357, 363 [73 P. 1050]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1334, p. 792.) If the purpose of the penalty is the same as that of punitive damages, however, the plaintiff cannot obtain a double recovery and must elect to have judgment entered in an amount which reflects either the statutory trebling or the compensatory and punitive damages. (*Marshall* v. *Brown* (1983) 141 Cal.App.3d 408, 419 [190 Cal.Rptr. 392].) When a statute recognizes a cause of action for a violation of a right, all forms of relief granted to civil litigants generally, including appropriate punitive damages, are available unless a contrary legislative intent appears. (*Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 215 [185 Cal.Rptr. 270, 649 P.2d 912].) But when a new right, not existing at

---

*See footnote 1, *ante,* page 811.

common law, is created by statute and a statutory remedy for the infringement thereof is provided, such remedy is exclusive of all others unless the statutory remedy is inadequate. (*Orloff* v. *Los Angeles Turf Club* (1947) 30 Cal.2d 110, 112-113 [180 P.2d 321, 171 A.L.R. 913]; *Strauss* v. *A. L. Randall Co.* (1983) 144 Cal.App.3d 514, 518-519 [194 Cal.Rptr. 520].)

 Here it is not disputed that the treble damages provision of section 17082 is punitive and similar in purpose to Civil Code section 3294 and hence plaintiff is not entitled to both remedies. Nor is it disputed that the treble damages provision is mandatory. (See *Uneedus* v. *California Shoppers, Inc.* (1978) 86 Cal.App.3d 932, 942 [150 Cal.Rptr. 596].)

Relying on *Marshall* v. *Brown, supra,* 141 Cal.App.3d 408, Sullivan contends it was entitled to an election of remedies. In *Marshall,* the plaintiff sued her previous employer based on statements the employer made to the plaintiff's prospective employer. She alleged both a cause of action for slander seeking compensatory and punitive damages and a civil action authorized by Labor Code sections 1050 and 1054 which provided that an employer who had discharged an employee or paid off an employee voluntarily leaving such service and by any misrepresentation prevented or attempted to prevent the former employee from obtaining employment was liable to the former employee for treble damages. (*Id.,* at pp. 411-412.) The jury found the employer had made a misrepresentation that prevented plaintiff from obtaining employment and found each defendant slandered plaintiff. (*Id.,* at p. 413.) The court found the Labor Code provision for treble damages was mandatory and punitive. (*Id.,* at p. 419.) Since the purpose of the treble damages provision was the same as that of punitive damages, the plaintiff was not entitled to both and had to elect between a judgment entered in an amount which reflected either the statutory trebling or the compensatory and punitive damages. (*Ibid.*)

*Marshall* does not support Sullivan's position, as in that case the plaintiff was pursuing two causes of action, each with different remedies though relying on the same facts. Here, Sullivan is relying solely on a statutory violation. It has not alleged, identified or pursued any alternate theory of liability nor has it pursued any common law tort cause of action that existed prior to the enactment of the Unfair Practices Act. As such, Sullivan is limited to a recovery of treble damages.

B., C.*

* * * * * * * * * * * * * * * * * * *

* See footnote 1, *ante,* page 811.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for a new trial limited to a determination of the amount of damages in accordance with part VIII of this opinion.* Each party shall bear its own costs on appeal.

Sims, Acting P. J., and DeCristoforo, J., concurred.

A petition for a rehearing was denied May 16, 1990, and the opinion was modified to read as printed above. The petition of appellant and respondent for review by the Supreme Court was denied July 11, 1990.

---

* Reporter's Note: Part VIII is contained in the nonpublished portion of the opinion. See footnote 1, *ante*, page 811.