Filed 2/8/22

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| SHELBY ANDERSON et al., | C089603 |
| Plaintiffs and Appellants, | (Super. Ct. No. STKCVUBC20130007198) |
| v. | |
| FORD MOTOR COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, W. Stephen Scott, Judge.  Affirmed.

Knight Law Group, Lauren A. Ungs and Roger Kirnos; The Altman Law Group, Bryan C. Altman and Christopher Urner; Greines, Martin, Stein & Richland, Cynthia E. Tobisman and Gary J. Wax for Plaintiffs and Appellants.

Greenberg Traurig and Jeff Eric Scott; Jones Day, Nathaniel P. Garrett, David J. Feder, Emily F. Knox and Margaret A. Maloy for Defendant and Appellant.

---

[*]  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I and III of the Discussion.

1

In October 2004, plaintiff Shelby Anderson (individually, plaintiff) and his wife, plaintiff Tammy Anderson (Tammy), bought a Ford Super Duty F-250 6.0 liter diesel pickup truck containing an engine sourced from nonparty ITEC, also known as Navistar (Navistar).  Plaintiff intended to use the truck into his retirement for hunting and fishing trips as well as camping trips with his wife.  He intended to tow a camping trailer, a horse trailer, and his boat.  Plaintiff chose the Ford for its power, towing capacity, and other qualities as represented by defendant Ford Motor Company (Ford) in brochures and advertisements and by Ford dealership sales agents.  Unbeknownst to plaintiffs, prior to and following launch, the vehicle line containing the 6.0 liter Navistar diesel engine was plagued with numerous problems with its air management system including the turbo, fuel injectors, and other components.  Plaintiff began experiencing issues with the truck during his second year of ownership.  After numerous attempts to have the vehicle repaired so it could perform the functions for which they purchased it, plaintiffs effectively gave up, rendering the truck a "driveway ornament."

After opting out as putative members of a class action involving the 6.0 liter diesel engine, plaintiffs sued Ford.  The jury found in favor of plaintiffs on their cause of action pursuant to the Song-Beverly Consumer Warranty Act (Song-Beverly Act), popularly known as the "lemon law" (Civ. Code, § 1790 et seq.),[1] their cause of action pursuant to the Consumers Legal Remedies Act (CLRA) (§ 1750 et seq.), and their fraud in the inducement–concealment cause of action.  The jury awarded plaintiffs $47,715.60 in actual damages, which was the original purchase price of the truck, $30,000 in statutory civil penalties under the Song-Beverly Act, and $150,000 in punitive damages.  The trial court granted plaintiffs' motion for attorney fees in the amount of $643,615.00.

---

[1] Further undesignated statutory references are to the Civil Code.

Ford appeals, asserting (1) plaintiffs' compensatory damages award must be reversed because they failed to produce any evidence to establish the actual value of the truck at the time of purchase, (2) plaintiffs cannot recover both a statutory civil penalty under the Song-Beverly Act and punitive damages for what Ford maintains was "substantially the same conduct," and (3) the trial court's attorney fee award "falls with the judgment."

Plaintiffs filed a cross-appeal raising three issues, although they note that, if we affirm the judgment, we need not reach the issues raised in their cross-appeal.

We affirm the judgment and damages awards. Because we do so, we do not reach the issues raised in plaintiffs' cross-appeal. Accordingly, we dismiss the cross-appeal as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs asserted six causes of action in the operative complaint: fraud in the inducement—intentional misrepresentation; fraud in the inducement—concealment; negligent misrepresentation;[2] fraud in the performance of a contract—intentional misrepresentation; violation of the CLRA; and violation of the Song-Beverly Act.

**Plaintiffs' Experiences with the Ford Truck and Attempts to Repair**

Planning for his retirement, plaintiff decided he was going to buy a new vehicle. Being an "outdoor kind of guy" who enjoyed fishing and hunting, he wanted a new truck. Based on his needs, as well as a bad experience he had with a smaller vehicle, plaintiff decided he "needed something big." Plaintiff wanted a "big strong powerful truck." He wanted something that could tow whatever camping trailer he acquired. He also intended to use the truck to tow his boat and a horse trailer.

---

[2] During trial, plaintiffs voluntarily dismissed the negligent misrepresentation cause of action as well as an implied warranty claim.

Considering different vehicles, he focused on "basic towing capacity, how strong and how powerful these vehicles were." Plaintiff was drawn to the Ford truck, as it was touted as "best in class. It had the most horsepower at that time and the best towing capacity and the most torque." Plaintiff collected most of the information he used in making his decision from a brochure and from television commercials. He believed the information in the brochure. As for the Ford commercials: "Their advertisements really showed the vehicle pulling and towing and the power and the torque and they would show a horse trailer. They would show a camping trailer. They would show it going through the mud over rough terrain in the dirt and it's like, 'That's—that's what I'm looking for.' "

Plaintiff also spoke to Ford salespeople, who verified information in the brochure. They reassured him the Ford truck was the best in its class, the best and most dependable truck on the market. Plaintiff had no doubt the Ford was capable of towing, and the Ford salespeople confirmed as much. Plaintiff relied on all of the information provided by Ford and Ford salespeople.

Plaintiff considered a Chevy, but, "when it came down to . . . putting them side-by-side the Ford was best in class, strongest motor, most horsepower, most torque, longevity. This motor, you know, with the knowledge that I had at that particular time I was expecting a very long time of ownership of this truck." He was drawn to the diesel version because it had a stronger motor, more power, more torque, and was more economical and long-lasting.

On October 21, 2004, plaintiffs agreed to purchase a new 2005 Ford F-250 "Super Duty" truck from Big Valley Ford in Stockton. The total sale price was $47,715.60. The truck came with limited warranties, including a limited three-year/36,000 mile bumper-to-bumper warranty, a limited five-year/100,000 mile 6.0L Powerstroke Diesel Engine warranty, and an additional limited emissions warranty of "three years, 50,000 miles or seven years, 70,000 miles . . . depending on the causal part that the failure is related to."

4

Other than the home he shared with his wife, the Ford truck "was the most expensive thing [plaintiff] had ever bought."

Initially, plaintiff loved his new truck. "It was like a dream come true. It was like 'Wow, this is really mine'. [He] was just very, very excited." However, during the second year that plaintiff owned the truck, the check engine light began to come on intermittently. Plaintiff contacted Ford and was told that, if it happened again, he should bring it in. Eventually, plaintiff brought the truck to the dealership. By this time, the truck had been driven 44,067 miles. When plaintiff saw the repair order upon picking up the truck, he was surprised about how much work had been performed. The repair invoice (exhibit 10), dated August 2007, indicated that technicians replaced the turbo. Anthony Micale, plaintiffs' automotive forensic expert, characterized the turbo as the "heart" of the engine and the "core of what makes this engine what it is." Pursuant to a recall, technicians changed the exhaust pressure sensor, which is one of the parts of the air management system. Technicians also had to steam clean the engine, a necessary measure when oil leaks result in "a lot of oil around the area" of the engine. Technicians also recalibrated the engine software.

The first time plaintiff tried to tow anything heavy was in September 2007. He and his wife rented a camping trailer to go to Gualala. As they drove on the coastal highway, they started up a steep grade when "all of a sudden this truck started making a—like it was barking at me like woof, woof, woof, woof . . . ." It also started shimmying. Believing the truck was going to stall, plaintiff looked for a place to pull off the road. He could not step on the gas; "[i]t couldn't go anymore." The truck just coasted. Plaintiff kept the truck "going forward so that I wouldn't cause an accident or I wouldn't disrupt the flow of traffic on the highway there and I tried to find a safe spot to pull this thing off so that I can get an idea of what just happened." Plaintiff's wife was "extremely scared." At the top of the grade, there was a pullout, so plaintiff pulled over and parked.

Plaintiff called the dealership after this experience. The dealership asked if the check engine light was on, and, when plaintiff responded that it was not, the dealership replied, "if it happens again, give us a call and we'll take a look at it."

Plaintiff brought the truck to the dealership in October 2008. At that time, the truck had 51,860 miles. The repair invoice (exhibit 13) indicated an oil leak from the bed plate gaskets. Additionally, the dealership again had to steam clean. Technicians installed a new bed plate gasket, a new front and rear cover gasket and seal. The invoice indicated plaintiff complained of a loud "chirp squeal" under the hood while towing a trailer. However, other than a road test, the invoice did not indicate technicians did anything to determine what the nature of the problem was. The invoice also did not indicate the road test entailed going up a grade or pulling a load.

Plaintiffs brought the truck in again approximately two months later, in December 2008. The truck had 52,404 miles on it. The repair invoice indicated technicians thought there was an oil leak at the rear of the engine. Additionally, there appeared to have been a coolant leak. A leak was coming from the top of the oil cooler, and, again, they had to replace gaskets. The mileage out, meaning the mileage when the vehicle left the dealership, was the same as the mileage in. No test drive was performed.

Plaintiff brought the truck in again in October 2009 at 59,070 miles. Plaintiff reported a loss of power when trying to go up a grade when towing and that the engine made a squealing and a chirping noise. Micale testified this complaint was consistent with the exhaust gas recirculation system (EGR), and the fuel injection system not working. The invoice indicated "Self test no codes. Road test did not verified [*sic*] no power." (Some capitalization omitted.) Technicians also did not verify the chirping sound. While the invoice indicated a road test was performed, the milage out was the same as the mileage in. The invoice indicated a vehicle data recorder (VDR), was to be installed to record data from the truck as it was being driven.

6

When plaintiff learned Ford wanted to install a VDR, he asked if it could be installed prior to an upcoming three-week hunting trip to Wyoming so it could record data for that entire trip. However, the dealership indicated that it could not have the VDR off premises for that long. Plaintiff experienced "all kinds of problems" with the truck on that trip.

A November 2009 invoice, when the truck had 61,910 miles, stated: "Client reports when going up a grade turbo pressure gauge at 10 engine starts to hesitate until about 20 psi. Trans down shifts. Turbo whistles. Then a surge of power. Install VDR. Client to return to have VDR downloaded." (Some capitalization omitted.) Plaintiff had the VDR on the truck for three to five days, but, when he returned to the dealership with the VDR, the technicians indicated it did not record any codes. Plaintiff wanted the VDR on for longer, and wanted to drive the truck with a trailer attached while the VDR was recording. The dealership told plaintiff its insurer would not allow that.

Plaintiff was never able to successfully tow a trailer with the truck. Every time he tried, when he would go up a grade, the truck would shake and cough and squeal and plaintiff would "back off" and "slow down and . . . let the truck do what I think the truck can do to get me to where I need to go."

Also, after his experience on the coastal highway, the truck would run rough even when plaintiff was not towing anything. As "time went on it didn't matter what [he] had and any time it seemed like [he] started pulling grades or going up in the mountains, altitude differences up in the high country, it would start doing it at a certain time when that turbo pressure was getting to that one point . . . ."

On another occasion, plaintiff got off the freeway and was approximately two miles from home. "All of a sudden everything in my dashboard went off, all of the lights, the radio went off, my tachometer went down to zero. I had nothing to my dashboard but I knew the truck was still running because I can hear it . . . ." At the time, plaintiff was about 200 feet from a busy intersection. As plaintiff approached the intersection, the

7

traffic light turned yellow. When he was 20 feet from the intersection, the truck died. The engine stopped and plaintiff lost his steering and brakes. Momentum carried the truck through the intersection. After the intersection, plaintiff turned into a parking lot. He had to stand on the brakes to stop the truck because he had no power. Plaintiff stood on the brakes with both feet and the truck finally stopped. Plaintiff replaced the alternator and had the batteries charged and was able to drive home.

On yet another occasion, the truck started shaking and lost power. Black smoke billowed out of the exhaust pipe. The truck was not running well at all, there was no power, and if plaintiff stepped on the accelerator, the truck would vibrate. Plaintiff called the dealership which had the truck transported in for service.

At this point, the truck had 65,475 miles. Onboard diagnostics revealed problems with the injectors. Discussing the inadequacy of the voltage supplied in relation to the injectors, Micale testified that the problem was "very significant." Technicians found the fuel injection control module (FICM) to be defective and they changed it. According to Micale, the FICM operates as the "brain of the injectors." Micale testified that he did not see that technicians performed any root cause analysis for why the FICM failed. He testified there was a reason the FICM was failing, and the technicians were not finding it. Testing revealed that two fuel injectors were failing.

Addressing the same service visit, another expert, Thomas Lepper, testified that what was denominated "GCQIS" was an internal Ford communication between Ford and the technician at the dealership about what was wrong with the vehicle. Ford directed the dealership technician to check the fuel pressure and focus on the FICM. Ford pushed replacement of the FICM. Ford's communication with the dealership did not indicate there were substandard injectors and substandard EGR valves, and did not set forth a comprehensive repair strategy. Lepper opined Ford's repair strategy was unreasonable. Ford had changed the turbo but did not look for the underlying problem. When the second turbo did not last, it was clear replacement of the turbo was not a solution, and the

8

repair strategy was thus unreasonable. Lepper also testified that it was inexcusable that Ford did not perform test drives during repair visits to verify the repair work was done properly.

When it returned the truck to plaintiff, the dealership told him they had fixed it. Plaintiff "was so hopeful that all of those times I had experienced every time I towed it it was finally fixed. I thought that it was finally fixed." This repair occurred in April 2010.

In August 2010, plaintiff took a hunting trip and was towing a horse trailer. As he drove the truck into the hills near Sonora, the truck started "barking" and "doing it all" again, doing "the same thing that it has always done . . . ." With the truck having more problems, plaintiff and his companions parked, saddled their horses, and rode the horses to camp.

On another occasion, plaintiff was near Oakdale when the truck's lights went off and power in the dashboard went out. He was traveling at about 65 miles per hour in traffic. Plaintiff warned the passengers in the truck that he was going to pull over, but before he did, the engine shut off. The truck coasted and plaintiff pulled over as soon as he could do so safely. Plaintiff again replaced the alternator and replaced both batteries.

Plaintiff was never able to use the Ford to tow heavy items. Eventually, he decided he simply could not drive it anymore. He bought a used Chevy 2500 to do what he had intended to do with the Ford. He previously had also bought a Toyota pickup for commuting.

At some point, plaintiff discovered he was not the only person experiencing these problems with a Ford truck. He called a phone number of a Dispute Settlement Board listed in the truck's owner's manual. He was directed to the Better Business Bureau. Plaintiff was sent a packet in the mail which he completed and submitted in January 2013. The relief he requested was: "I would like Ford to refund me all the money I spent on this vehicle." The Better Business Bureau responded that plaintiff's complaint was

9

not within the jurisdiction of its program and specified his claim was not filed within six months after expiration of applicable warranty periods.

As of the time of trial, plaintiff still had the truck. He still had the same problems and it had not been fixed. The truck still had oil leaks and surging issues. He had not driven the truck for more than two years other than ensuring the batteries were charged. He continued to maintain the truck. He also began to carry a fire extinguisher in the truck in case of fire and a toolkit to perform repairs. Plaintiff characterized his Ford truck as nothing more than "a driveway ornament." He had driven the truck approximately 120,000 miles.

Asked if he had ever tried to sell the truck, plaintiff responded he had not, and that "I wouldn't sell this truck to my worst enemy right now." Asked about the value of the truck, plaintiff responded: "There is really no value to it to me at all right now, none."

**Ford's Awareness of the Issues with the 6.0 Liter Engine**

Micale had reviewed documents Ford generated concerning the production and sale of the 6.0 liter vehicle. With regard to Ford's development of the 6.0 liter diesel engine, Micale opined that there has been an "abridgment" or "circumvention" of Ford's standard development. According to Micale, that process "[h]as not been followed."

Micale also testified about a number of internal Ford corporate communications concerning the 6.0 liter engine. Some of them were sent prior to plaintiff's October 21, 2004, purchase and some were dated after, but all exchanges occurred before plaintiff brought the truck in for the first time in August 2007.

Micale testified about a September 7, 2004, e-mail from Ford's Director of Service Engine Operations, Frank Ligon, following the launch. This was a little more than a month before plaintiff made his purchase. By this time, the truck line had been in production for two years. In the e-mail, Ligon stated, in part: "We are seeing a new group of concerns that range from chaffing of various wiring harnesses causing drivability concerns, sensors that are failing at a high rate and turbo concerns. . . .

10

Bottom line is we are not 'out of the woods' on this 6.0 and in fact may experience repeat symptoms once certain repairs are performed . . . . [¶] At this point we do not have a definitive repair action or production parts to properly address the concern universe. The best course of action is to have the Dealer contact the hotline. I strongly urge that this information NOT be shared at this time until the 'official' action is announced." Characterizing this e-mail, Micale testified: "There is no repair action. . . . There is no action. There is no plan. There is nothing out there they can do. There is nothing they can go to." Micale later testified this email indicated Ford was trying to bring the 6.0 liter engines up to standard two years after launch.

Micale testified about an October 8, 2004, e-mail, this one sent by Mike Berardi, an Engineering Manager at Ford Customer Service Division. This was approximately two weeks before plaintiffs' purchase. The e-mail noted that the proposed initiatives "will not eliminate the RAVs [reacquired vehicles]," meaning Ford was buying vehicles back, "as customers will continue to come into the dealership multiple times until we can honestly eliminate all the concerns with the 6.0L." According to Micale, this email indicated "[t]hey don't have a resolution and they are worried about having to buy back vehicles."

In another internal communication, dated September 7, 2005, Scot G. McDonagh, Powertrain Quality Leader, stated that "we are seeing a huge increase in early warranty for the 6.0L engine from June 1st through current production." The communication also indicated Ford had not determined the root cause of the problems with the 6.0 liter engines.

In a January 22, 2006, e-mail, John Koszewnik, Director of Diesel North American at Ford, stated that "[i]njector warranty remains our higher warranty item and last month went through the roof . . . $9.8 million for a single month." Ligon and Berardi were recipients of the e-mail, which was shared among people in "upper level positions" at Ford. In a prior e-mail copied in the chain, Ligon stated: "To be honest I am very

11

concerned.  The company is going to be in trouble if we keep replacing injectors at the rate we're doing it and it seems to be getting worse.  If we advertise we have carte blanche replacement it will surely get worse and we may never get beyond this."

Micale further discussed an e-mail from Koszewnik dated February 5, 2006, (exhibit 64), which stated, "we're now running about $36 million a year, but we have been as high as $5 million a month!  A large part of this was driven by International's use of a 15 newton linear solenoid EGR valve versus the industry standard of a 200 newton DC motor driven valve. . . ."

Another e-mail Micale discussed was sent by Mike Frommann, Warranty Program Supervisor, on June 13, 2006.  In this e-mail, Frommann notes:  "We unfortunately exceeded our own cylinder pressure specs in normally performing engines.  We don't want to have our cylinder pressure specs published or documented by having them subpoenaed or we might face a class action.  When we have a defect, we have to honor our warranty.  The presence of aftermarket equipment doesn't change the fact.  I did advise that we tell the customer a repeat failure will not be covered, as we have not seen these come back when the head gasket is replaced.  I recommend we delete these emails."  Based on his review, Micale testified that the information concerning the 6.0 liter engines exceeding cylinder pressure specs was not shared with consumers or potential buyers.

Another Ford document was titled:  "6.0L Powerstroke Injector:  December 2005 Warrant Claims" "Analysis of Warranty Claims to find the 'Technical Contradictions' which needs [sic] to be resolved, before the problem can be solved."  Dated January 31, 2006, this document showed that "[t]he warranty for 2003, 2004, 2005 and now 2006 [model year] show showing [sic] somewhat similar trends, a very high base warranty with an increase in claims during the colder months."  According to Micale, "an engineer would conclude from this that we have a consistent pervasive problem and I think this is dealing with fuel injectors . . . ."  The document reflected that there had been "many

changes made to 'fix the Injector' warranty issue, but none seem to have been effective at reducing the base level of the warranty."

Micale also reviewed an "In-Market CBG Quality Review" document dated February 3, 2006, and prepared by Barb Samardzich, a Vice President at Ford. The document indicated that, to date, $112.5 million had been expended on the 6.0 liter warranty for fuel injectors, $42.3 million for EGR valve issues, $91.2 million for turbo issues, and $19.4 million for head gasket issues.

Another document Micale reviewed, "ITEC and Large Diesel Strategy Review," dated February 3, 2006, indicated that the "diesel strategy is potentially the single most important issue facing Ford." It went on to state that "[o]ver $2 billion of annual Super Duty profit is at risk," that "[c]ommercial issues with ITEC" sourced from Navistar "now exceed $1 billion," and that "[i]nvestments required could easily exceed $1 billion."

In addition to internal Ford corporate documents, Micale reviewed an affidavit prepared for a lawsuit in state court in Michigan between Ford and Navistar, dated February 28, 2007. In it, the affiant, Mina Shams, the 6.0L Diesel Systems Diagnostics Supervisor at Ford, stated that "Navistar used a new, non-industry standard fuel injector system for the 6.0L, which has resulted in a large number of warranty claims. Ford and Navistar have worked together on several joint projects to address specific injector issues. Despite improvements resulting from these efforts, total warranty repair costs on 6.0L fuel injectors exceed $227 million."

In an affidavit dated February 28, 2007, in the same Michigan lawsuit, Bob Fascetti, Director of V-Engine and Diesel Engineering for the North American Engine organization of Ford, stated that Ford had "experienced unprecedented repair rates with the 6.0L engines. The 6.0L has had the largest R/1000 (repairs per thousand) rate ever experienced by Ford for an engine in widespread production. In fact, the 6.0L, which represents only 10% of Ford's total engine volume, accounts for approximately 80% of

13

all of Ford's warranty spending on engines. Additionally, warranty spending on the 6.0L accounts for approximately 25% of Ford's overall warranty spending."

Micale opined that "Ford employees are aware of problems associated with the air management system and that being all the components we went through on the air management system, FICM, the injectors, the EGR valve, the EGR cooler, the oil cooler, overboost, turbocharger, turbo veins, turbo vein control, injector control pressure, injector pressure regulator, all of those pieces are what the employees are aware of that are failing and causing problems on the 6.0 Liter engine." He further opined that software updates had caused a decrease in vehicle performance.

Micale repeatedly testified that the proposed solutions and repairs appeared to address symptoms rather than the cause of the problems.

Asked if any of the information about the problems with the engine was communicated to potential buyers, Micale responded, "None of this. None of this whole story has been communicated to potential buyers, these buyers."

Plaintiff himself testified no one revealed to him that Ford trucks had unprecedented failure rates in their turbochargers, fuel injectors, EGR valves, FICMs, or anything similar. Had anyone told him about these issues when he was considering purchasing the truck, there was no doubt in his mind that he "would have got up and walked out of the dealership."

**Impairment in the Use, Value, and Safety of Plaintiffs' Truck**[3]

Lepper was an expert in the automotive field including insurance work. He also worked as an automotive expertise consultant and he had experience appraising cars.

---

[3] "A defect or nonconformity for purposes of Song-Beverly is defined as 'a nonconformity which substantially impairs the use, value, or safety of the new motor vehicle to the buyer or lessee.' " (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1331, quoting § 1793.22, subd. (e)(1), fn. omitted; see also CACI No. 3204.)

14

Lepper testified he had inspected nearly 300 6.0 liter engine trucks involved in lawsuits against Ford.

For this case, Lepper reviewed the repair orders, both plaintiffs' deposition testimony, the testimony of a Ford expert, technical service bulletins, and other Ford materials. He also attended a vehicle inspection of plaintiffs' truck performed by Ford. At the inspection, Ford performed a test drive, although it did not involve a trailer. Plaintiffs' vehicle still had a check engine light lit at the inspection. The inspection revealed a problem with the vehicle's "boost." The truck's turbocharger veins were not properly turning. There were also quite a few oil leaks. Lepper testified "I see a lot of oil leaks on these. This is a common failure when we are running a boost problem, you push out the seals and start leaking." At this inspection the truck had 121,176 miles on it.

Lepper testified that Ford's Super Duty diesel trucks are represented by the dealership to last between 300,000 and 500,000 miles. The turbo is supposed to last 250,000, but plaintiffs' turbo was replaced at 44,000 miles, and there remained turbo issues at the vehicle inspection.

Lepper testified that, in his opinion, the 6.0 liter engine in plaintiffs' truck had affected the use, value, and safety of the vehicle.

Lepper testified he considered the impairment to the use of the truck significant for two reasons. First, when a vehicle is being repaired frequently, it is not available to the owner for use. In this regard, plaintiff testified he was without the use of the truck for a total of 49 days due to repairs. Second, Lepper testified that people such as plaintiff buy a truck to perform specific functions that plaintiffs' truck was not able to perform.

Lepper next testified that the impairment of value had been significant. He opined that, because "the truck has been so bad it's got only just a little bit of use of it so he's had to shoulder a way unfair portion of the depreciation of that truck." Asked whether CarMax or Kelley Blue Book assign a value to a car that is a "lemon," Lepper testified: "That value is zero, no value assigned." He testified he had "personal experience of

15

people who won't buy a 6.0 diesel-powered truck." He testified that a potential buyer informed of the difficulties with the truck would either "walk away or substantially reduce the amount they are willing to pay. If I was buying this truck, I would be worried about having to reaccomplish all of these problems again."

Finally, Lepper testified there had been a significant impairment to the truck's safety. He testified that the vehicle's inability to maintain sufficient speed, such as going uphill, particularly where there is no place to pull off the road, puts the vehicle occupants in an unsafe position. He also testified that "[b]ad things are happening when you're leaking oil and losing power." For example, if you are in an intersection and the "boost doesn't come up, the veins are stuck, you don't have enough power to move out of the intersection at an expected rate. Somebody is coming the other way, you are moving across a two-lane highway. There is lots of two-lane roads out in the area where they live. They are exposed to an unreasonable safety risk . . . ." Lepper indicated that all of these engines he had seen had the same power loss problem. He further testified there is no way for a driver to predict when such loss of power might happen; there are no warning signs.

**Verdict**

The jury found in favor of Ford on plaintiffs' fraud in the inducement—intentional misrepresentation and fraud in the performance of a contract—intentional misrepresentation causes of action.

The jury found in favor of plaintiffs on the Song-Beverly Act cause of action and awarded them $30,318.30, representing the amount paid for the truck, $47,715.60, less the value of use, as statutorily prescribed (§ 1793.2, subd. (d)(2)(C)), calculated as $17,397.90.[4] Further, because the jury found Ford *willfully* failed to repair the truck after

---

[4] The $30,318.30 figure is off by $0.60. In any event, as plaintiffs note, Ford has not challenged the jury's computation, but, more significantly, for the compensatory damages

16

a reasonable number of attempts or make restitution, the jury imposed an additional $30,000 civil penalty under the Song-Beverly Act.  (§ 1794, subd. (c).)

The jury found in plaintiffs' favor on their fraud in the inducement—concealment cause of action and awarded damages in the amount of $47,715.60.

The jury also found in plaintiffs' favor on their CLRA cause of action and awarded damages in the amount of $47,715.60.

In phase 2, the jury awarded plaintiffs $150,000 in punitive damages.

Thus, the jury awarded plaintiffs $47,715.60 in actual damages, $30,000 as a Song-Beverly Act civil penalty, and $150,000 in punitive damages for a total of $227,715.60, with interest.  The trial court granted plaintiffs' motion for attorney fees in the amount of $643,615.00, with interest.

## DISCUSSION

### I.  Compensatory Damages Award

### A.  Additional Background

The trial court instructed the jury regarding damages as follows:  "If you decide that plaintiffs have proved their claim against Ford . . . you must also decide how much money will reasonably compensate plaintiffs for their harm.  This compensation is called damages.  [¶]  Plaintiffs must prove the amount of their damages.  However, plaintiffs do not have to prove the exact amount of damages that will provide reasonable compensation for the harm.  You must not speculate or guess in awarding damages.  [¶] *The following are the specific items of damages claimed by the plaintiffs*:  [¶]  *The difference between the amount that plaintiffs paid and the fair market value of the property at the time of sale . . . .*"  (Italics added.)

---

award, plaintiffs elected the CLRA damages over the Song-Beverly Act compensatory damages.

17

## B.  Ford's Contentions

Ford asserts that the compensatory damages award must be reversed because plaintiffs produced no evidence of the actual value of the truck at the time of purchase. Ford maintains that damages for fraud and for a violation of CLRA are both limited to the difference between the purchase price and the actual value of the truck at the time of purchase.  Ford further asserts that, inasmuch as the jury awarded the full purchase price of the truck, the jury necessarily impliedly found that the truck was worth $0 at the time of purchase, a finding, Ford asserts, is not supported by substantial evidence because it is refuted by other evidence.  According to Ford, plaintiffs introduced no evidence to support a factual finding that the truck was objectively worth $0 at the time of purchase. Thus, there is no substantial evidence to support the jury's award of compensatory damages.

## C.  Standard of Review

" 'We review the jury's damages award for substantial evidence, giving due deference to the jury's verdict . . . .' " (*Johnson v. Monsanto Co.* (2020) 52 Cal.App.5th 434, 449, quoting *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 300.) "Substantial evidence means evidence of ponderable legal significance that is reasonable, credible, and of solid value.  [Citation.]  Substantial evidence review is deferential to the factfinder." (*Gillotti v. Stewart* (2017) 11 Cal.App.5th 875, 899.)  "Under the well-established standard of review applicable to a claim that a judgment or finding is not supported by the evidence in the record, 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment.  [Citations.]  [¶]  It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact.  Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more

18

different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the [trier of fact's] findings and decision, resolving every conflict in favor of the judgment.' " (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 595-596 (*Regalado*), italics added, quoting *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.) Under the substantial evidence test, reversal " ' "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

### D. Measure of Damages

California law generally limits a defrauded party to recovering out-of-pocket damages as provided in section 3343. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240.) Section 3343, subdivision (a) provides, in pertinent part, "[o]ne defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction." "[A]ctual value" within the meaning of section 3343, subdivision (a) means "market value." (*Nece v. Bennett* (1963) 212 Cal.App.2d 494, 497, citing *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 753 (*Bagdasarian*).)

In *Bagdasarian*, on which both parties rely, the court referenced a definition of "market value": "in deceit cases the value of an article 'is normally determined by the price at which it could be resold in an open market or by private sale *if its quality or other characteristics which affect its value were known*.' " (*Bagdasarian*, *supra,* 31 Cal.2d at

19

p. 753, italics added, citing Rest., Torts, § 549, com. c.) Thus, the market value of the Ford truck at issue here would be the price at which it could be sold in an open market if all of its defects and limitations were known at the time of sale.

It appears the same measure of damages is employed under the CLRA. Section 1780, part of the CLRA, authorizes an action, among other things, to recover "[a]ctual damages." (§ 1780, subd. (a)(1); see also *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 675 ["To determine the amount of actual damages for a CLRA award, the trial court applied a market approach as set forth in [§] 3343, [subd.] (a)"]; *Nguyen v. Nissan North America, Inc.* (9th Cir. 2019) 932 F.3d 811, 818 ["Plaintiff's proposed benefit-of-the-bargain measure of damages is both cognizable under the CLRA and a reasonable basis of computation. Courts have viewed similar [market approach] models of recovery favorably in the past," citing *Colgan*].)

### E. Analysis

The jury awarded plaintiffs $47,715.60 in compensatory damages. We must determine whether this award is supported by substantial evidence.

Plaintiffs purchased the truck on October 21, 2004, for a total sale price of $47,715.60, the precise amount the jury awarded in compensatory damages. The obvious inference to be drawn is that the jury concluded the value of the truck at the time of purchase was $0.

According to Ford, in opposing its motion for judgment notwithstanding the verdict,[5] plaintiffs "pointed to two buckets of evidence that they claim support the jury's finding that the truck they drove for 120,000 miles was worth $0." The first of these "buckets" was Lepper's testimony that car valuation books do not assign a value to a

---

[5] The trial court did not rule on this motion within the time statutorily prescribed. The effect of the failure to rule within the time prescribed was "a denial of that motion without further order of the court." (Code Civ. Proc., § 629, subd. (b).)

20

vehicle that is a lemon. The second of these "buckets" was testimony, from both plaintiff and Lepper,[6] that some people will not purchase a truck with the issues this truck had. Plaintiffs on appeal rely on the same two categories of evidence as constituting substantial evidence supporting the jury's compensatory damages award.

### 1. Lepper's Testimony

Lepper had experience appraising vehicles. Asked, based on his experience appraising vehicles, whether CarMax or Kelley Blue Book assign a value to a car that is a "lemon," Lepper testified: "That value is zero, no value assigned." Lepper's testimony is fairly understood as the value of a lemon is $0.

In its reply brief, Ford asserts that, in context, Lepper's statement amounted to him "clarifying" his initial statement, "[t]hat value is zero," by then stating, "no value assigned." Ford suggests the import of Lepper's testimony, therefore, was not that the value of a lemon is $0, but that the valuation books "choose not to assess what the market value [of a lemon] is." Ford asserts that "[t]aking no position regarding value is not the same as taking the position that the value is zero."

Ford's interpretation arguably may be an interpretation of Lepper's testimony. However, another interpretation of his testimony, one apparently credited by the jury, is that the "value [assigned to a lemon] is zero," as in $0, and that, in further stating "no value assigned," Lepper was testifying that "no value," *as in no value whatsoever, zero value*, is assigned to such vehicles.

As stated *ante*, in reviewing the judgment to determine whether it is supported by substantial evidence, " 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment' "; " 'if two or more different inferences can

---

[6] Ford inaccurately identifies this testimony as being that of Micale rather than Lepper.

reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact' "; and we " 'must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the [trier of fact's] findings and decision, resolving every conflict in favor of the judgment.' " (*Regalado, supra*, 3 Cal.App.5th at pp. 595-596.) In light of these principles, substantial evidence supports the conclusion that, according to Lepper, the value assigned to a vehicle that is a lemon is $0.

Ford further asserts Lepper's testimony was not evidence that *plaintiffs' truck itself* was worth $0 when plaintiffs purchased it. However, in light of all of the trial evidence concerning plaintiffs' truck, and the jury's verdict, particularly in light of its verdict on the Song-Beverly Act "lemon law" cause of action, we have no difficulty inferring that the jury determined plaintiffs' truck was, indeed, a "lemon."

Thus, substantial evidence supports the conclusion that plaintiffs' truck was a lemon at the time they purchased it, and, as such, at that time, it had a value of $0. Plaintiffs assert that the foregoing alone is sufficient substantial evidence supporting the jury's implied finding that the truck's fair market value at the time plaintiffs purchased it was $0. We agree.

Lepper also testified that a potential buyer informed of the difficulties with the truck would either "walk away or substantially reduce the amount they are willing to pay." According to Ford, this testimony, that some will not buy a truck based on their subjective intolerance for engine issues, was not objective evidence that the truck was worth $0. In this context, we conclude Lepper's testimony was relevant evidence also supporting the judgment. Lepper's testimony supports the conclusion that a reasonable buyer, knowing the true condition of the truck and the nature, significance, and extent of the vehicle's defects, would not have purchased it, but instead would have "walk[ed] away." Indeed, he testified that "[i]f I was buying this truck, I would be worried about having to reaccomplish all of these problems again." While his testimony also suggested

22

that some buyers might purchase the truck knowing the nature and extent of its defects, but at a "substantially reduce[d]" price, we conclude that at most, this evidence gave rise to an internal conflict in Lepper's testimony which the jury obviously resolved in favor of a finding that no reasonable buyer would purchase the truck knowing the true nature and extent of its defects, a finding supported by substantial evidence. Indeed, a reasonable jury could have resolved this conflict and determined, that, especially in light of the safety problems related to the truck's defects, nobody would purchase the truck at any price.

## 2. Ford's Additional Contentions

Ford maintains that four items of evidence are probative of the conclusion that the truck had "considerable value" at the time plaintiffs purchased it: (1) the value the jury assigned for the use of the truck for purposes of plaintiffs' Song-Beverly Act claim, $17,397.90; (2) the fact that plaintiffs drove the truck more than 120,000 miles over nearly 12 years and procuring a substitute vehicle to drive those miles would cost a substantial sum of money; (3) plaintiff's testimony that, during the early years of his ownership of the truck, it had value to him; and (4) on an occasion when the truck was stolen, plaintiff submitted an insurance claim, under penalty of perjury, representing that the value of the truck was the full purchase price of $47,715.60.

### a. The Song-Beverly Act Statutory Deduction

According to Ford, the statutorily required amount the jury found to be the value of plaintiffs' use of the truck at the time it was first brought in for repair was, at a minimum, a finding under the Song-Beverly Act that the truck had some value at the time of purchase. Plaintiffs counter that "the reason for the mileage offset was because it was *statutorily prescribed*, not because the jury made a factual finding about the vehicle's value." (Original italics.) We agree with plaintiffs.

Section 1793.2, subdivision (d)(2)(C), part of the Song-Beverly Act, governs restitution and provides, in pertinent part: "When restitution is made pursuant to

23

subparagraph (B), the amount to be paid by the manufacturer to the buyer may be reduced by the manufacturer by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity. The amount directly attributable to use by the buyer shall be determined by multiplying the actual price of the new motor vehicle paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, by a fraction having as its denominator 120,000 and having as its numerator the number of miles traveled by the new motor vehicle prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity. Nothing in this paragraph shall in any way limit the rights or remedies available to the buyer under any other law." It was pursuant to this provision the jury reduced the compensatory award under the Song-Beverly Act by $17,397.90.

This does not constitute the jury's factual finding that the vehicle had any particular value at the time of purchase; it was merely an application of the statutory mandate related to restitution.[7]

### b. Mileage Plaintiffs Put on the Truck

Plaintiffs drove the truck more than 120,000 miles. Based on this, Ford asserts the truck certainly had some value. Ford argues that procuring a substitute vehicle to drive those miles would have cost a substantial sum of money. Notwithstanding the fact that

---

[7] Ford contends that the "jury's determination came as part of a legislative recognition that the purchaser of a defective vehicle receives value from the vehicle's use, at least until it is taken in to be repaired." Ford cites no authority for its supposition concerning legislative intent. Regardless of the legislative intent behind this provision, we are not persuaded that the jury's dutiful following of the legislative formula, without more, amounts to a factual finding by the jury that plaintiffs' truck had a specific value at the time of purchase.

24

plaintiff drove those miles on the Ford, that truck was utterly worthless for the purposes for which plaintiffs purchased it. More importantly, we have concluded, that under the fair market value approach, substantial evidence supports the conclusion that no reasonable buyer, knowing the condition of the truck, the extent and significance of its defects, and the safety risks associated with driving it would have purchased it, and thus it had a market value of $0.

Ford also asserts that, at a minimum, the truck was worth "thousands of dollars in scrap parts." However, there is no evidence in the record on this point, so we reject the argument.

### c. Plaintiff's Feeling About the Truck in the Beginning

Ford also points to plaintiff's testimony that, during the early years of his ownership of the truck, it had value to him as evidence establishing the truck had considerable value at the time plaintiffs purchased it. This testimony—that plaintiff initially loved his new truck, and that it "was like a dream come true. It was like 'Wow, this is really mine'. [He] was just very, very excited"—is precisely the type of subjective owner valuation Ford elsewhere insists is not competent objective evidence of fair market value.[8] In any event, we conclude this evidence did not establish that the truck had any particular objective market value at the time of purchase and at best, it provided conflicting evidence to the substantial evidence establishing a $0 value.

### d. The Insurance Form

Plaintiffs' truck was stolen in 2008 and subsequently recovered. At the time, plaintiff submitted an insurance claim form, denominated "Affidavit of Vehicle Theft,"

---

[8] Elsewhere in its briefing, Ford argues: "[Plaintiff's] own subjective valuation of the truck is not sufficient evidence that his truck was objectively valueless on the date of sale. Numerous cases have recognized that subjective valuations like those offered by the [plaintiffs] do not suffice to meet their burden of proving the actual value of a product at the time of purchase."

under penalty of perjury. The form had a field for "Value of Vehicle?" Handwritten in that field was the purchase price of the truck: $47,715.60. Plaintiff testified that he listed the value of the truck as $47,000 "and change," "what [he] paid for it . . . ."

We do not consider plaintiff's representation on this May 19, 2008, insurance form, indicating as the "Value of Vehicle," the amount he paid for the truck on October 21, 2004, to be competent evidence of the market value of this truck at the time of purchase, or at the time of theft, so much as simply the amount plaintiff originally paid for the truck. Again, at best, this evidence presented a conflict in the evidence that was up to the jury—not us—to resolve.

### 3. Conclusion

We conclude that substantial evidence supports the jury's implied finding that, at the time plaintiffs purchased the truck, its value was $0. Certainly, we cannot say that " ' " 'upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142.) Therefore, we conclude substantial evidence supports the jury's compensatory damages award.[9]

## II. Recovery of both Punitive Damages and the Song-Beverly Civil Penalty

### A. Additional Background

Ford filed objections to the proposed judgment following the jury verdict, asserting that the judgment could not award both punitive damages and Song-Beverly civil penalties. Ford argued that both awards addressed the same issue: punishing Ford for violation of plaintiffs' primary right to a working vehicle in exchange for their payment, "a right they simply alleged was violated in different ways." Ford asserted that,

---

[9] In light of our conclusion, we need not address plaintiffs' alternative contention, in effect, that reliance damages more than offset any value the truck had at the time of purchase so as to constitute substantial evidence supporting the compensatory damages award.

26

by seeking civil remedies under the Song-Beverly Act, plaintiffs elected their remedy and were barred from recovering punitive damages. In the alternative, Ford asserted that, because plaintiffs were not entitled to both civil penalties and punitive damages, they were required to elect their punitive remedy.

Plaintiffs responded that the conduct punished by the fraud/CLRA punitive damages award was not the same as the conduct addressed by the Song-Beverly Act civil penalty. The former, plaintiffs argued, was based on pre-sale fraudulent conduct inducing plaintiffs to buy the truck whereas the latter was based on failure to repair the truck after a reasonable number of repair attempts, replace the truck, or make restitution to plaintiffs. In responding to Ford's primary right argument, plaintiffs asserted that fraudulent inducement and Song-Beverly Act violation involved separate legal duties. They further argued, "[f]raudulent inducement does not necessitate a Song-Beverly Act violation, and a Song-Beverly Act violation does not necessitate fraudulent inducement." And they argued, "[t]he violations occurred over three-years apart (at a minimum) based on different statutes and different wrongful actions." Plaintiffs continued: "Undoubtedly, some of the evidence at trial overlapped in support of many different causes of action, for example, the internal emails presented at trial showed evidence of Ford's knowledge of its misrepresentations and concealment, but they were also probative of willfulness for purposes of Plaintiffs' Song-Beverly claim. The analysis for election of remedies involves inquiry into what the <u>wrongful conduct</u> is, not what evidence supports it, and indeed the issue is to avoid double punishment for the <u>same</u> wrongful conduct. Here, the unlawful conduct for the pre-purchase fraud-based claims awarding punitive damages is distinct from the Song-Beverly Act claim awarding civil penalties because the wrongs for the former occurred <u>before</u> purchase while the wrongs for the latter took place years <u>after</u> purchase." (Original underlining.)

The trial court overruled Ford's objection. Indicating that the answer to the question presented was not clear, the court stated: "I'm persuaded by plaintiff's counsel

27

on this matter. I'm going to overrule this objection. I think they are both separate and stand-alone conduct, and I think the message being sent was directed to two different types of conduct."

## B. Ford's Contentions

Ford asserts plaintiffs cannot recover both punitive damages on their fraud/CLRA claims and a statutory civil penalty under the Song-Beverly Act. Ford proposes a test for what it calls the "no-double-punitives rule." According to Ford, a plaintiff cannot recover both a statutory penalty and punitive damages when (1) a statute creates a "penalty or multiple damages" provision, (2) the statutory award is punitive in nature, and (3) the punitive damages and the statutory penalty were based on "substantially the same conduct." Ford maintains that all three elements are satisfied here. We disagree. The two awards were based on different conduct, occurring at different times.

## C. Punitive Damages and Song-Beverly Act Civil Penalties

Section 3294, subdivision (a), governing punitive damages, provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (§ 3294, subd. (c)(2).) " 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (§ 3294, subd. (c)(3).) " 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (§ 3294, subd. (c)(1).)

28

" 'The [Song-Beverly Act] provides enhanced remedies to consumers who buy new consumer goods accompanied by a manufacturer's express warranty.' " (*Santana v. FCA US, LLC* (2020) 56 Cal.App.5th 334, 346 (*Santana*).) " 'Where . . . service or repair of the goods is necessary because they do not conform with the applicable express warranties, service and repair shall be commenced within a reasonable time by the manufacturer . . . .' " (*Ibid*., quoting § 1793.2, subd. (b).) " 'If the manufacturer . . . is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer . . . .' " (*Santana*, at p. 346, quoting § 1793.2, subd. (d)(2).) "Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." (§ 1794, subd. (a).) With exceptions not relevant here, "[i]f the buyer establishes that the *failure to comply was willful*, the judgment may include, in addition to the amounts recovered under subdivision (a), a civil penalty which shall not exceed two times the amount of actual damages." (§ 1794, subd. (c), italics added.)

### D. Analysis

Ford challenges the trial court's ruling, arguing: "(1) it cannot be squared with how precedent has defined 'substantially the same' conduct; (2) it disregards that punitive damages for wrongful sale of a defective car and the penalties authorized under the Song-Beverly Act serve the same purpose; and (3) it defies the realities of how the [plaintiffs] presented and argued their case for punitive damages."

Throughout its briefing, Ford primarily relies on *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218 (*Troensegaard*). There, the subject of the action was a mobile home that exuded formaldehyde fumes. (*Id*. at p. 221.) After moving into the mobile home, the plaintiff noticed an unpleasant odor which soon made

29

her ill.  (*Id*. at pp. 223-224.)  The defendant manufacturer had the home tested, but concealed from plaintiff the results showing unacceptably high levels of formaldehyde.  (*Id*. at p. 224.)  And the defendant's remedial efforts did not fix the problem.  (*Ibid*.)  The jury awarded the plaintiff $55,000 in punitive damages and a civil penalty under section 1794, subdivision (c) in the amount of $90,000, both of which were based on conduct that took place *after* the plaintiff purchased the motorhome—the intentional concealment of the formaldehyde report and the failure to comply with the express warranty by taking appropriate corrective action or otherwise making plaintiff whole.  (*Id*. at pp. 221, 226.)

Discussing punitive damages, the *Troensegaard* court stated the following:  "Punitive damages impose a penalty and thus a *forfeiture*.  ' "Forfeiture" imports "a penalty" . . . , "a requirement to pay the sum mentioned as a mulct for a default or wrong." '  [Citation.]  'The law traditionally disfavors forfeitures and statutes imposing them are to be strictly construed.' "  (*Troensegaard*, *supra*, 175 Cal.App.3d at p. 227.)  The *Troensegaard* court relied on a federal district court case which held:  " 'A defendant has a due process right to be protected against unlimited multiple punishment *for the same act*.  A defendant in a civil action has a right to be protected against double recoveries not because they violate "double jeopardy" but simply because overlapping damage awards violate that sense of "fundamental fairness" which lies at the heart of constitutional due process.' "  (*Ibid.*, italics added, quoting *In re Northern Dist. of Cal. "Dalkon Shield" IUD Products Liability Litigation* (N.D.Cal. 1981) 526 F.Supp. 887, 899 (*Dalkon Shield*), vacated on other grounds by *In re Northern Dist. of Cal. "Dalkon Shield" IUD Prod. Liab. Litig.* (9th Cir. 1982) 693 F.2d 847.)

In advancing its argument that the trial court's ruling cannot be squared with how precedent has purportedly defined "substantially the same conduct," Ford relies on language in *Troensegaard* where the court stated that the civil penalty and the punitive damages award were "based upon *substantially* the same conduct of" the defendant and thus plaintiff could not recover both punitive damages and the civil penalty.

(*Troensegaard, supra*, 175 Cal.App.3d at p. 226, italics added.) And as set forth *ante*, Ford plugs the italicized language into its proposed test for what it calls the "no-double-punitives rule" as the third of three elements.

In our view, the appropriate inquiry should be focused on the underlying conduct. And as we discuss *post*, the conduct here was not substantially the same. Moreover, we are not convinced that the appropriate test is whether the conduct is "substantially" the same. The *Troensegaard* court employed that phrase including the word "substantially" but once. (*Troensegaard, supra*, 175 Cal.App.3d at p. 226 [observing that "each of the awards was based upon substantially the same conduct of" the defendant].) On the other hand, the court also relied on a federal case stating a " 'defendant has a due process right to be protected against unlimited multiple punishment *for the same act*.' " (*Id*. at p. 227, italics added, quoting *Dalkon Shield, supra*, 526 F.Supp. at p. 899.) And the *Troensegaard* court subsequently concluded: "We are of the opinion that had the Legislature, by Civil Code sections 3294 (permitting punitive damages) and 1794 (permitting a civil penalty), intended a double recovery of punitive and penal damages for *the same* willful, oppressive, malicious, and oppressive acts, it would in some appropriate manner have said so." (*Troensegaard*, at p. 228, original italics omitted, italics added.) Our reading of *Troensegaard* is that the court's holding was based on conduct that was the same, i.e., identical, not just "substantially" the same.[10] And that conduct took place at the same time, post-sale during the warranty repair process.

_____

[10] The *Troensegaard* court's description of the conduct underlying each award demonstrates that the conduct was identical, not merely substantially the same. The court wrote the following about the specific acts supporting punitive damages: "We are of the opinion that [the defendant's] intentional concealment from plaintiff of the high level of formaldehyde fumes found in the mobilehome, *and* its failure substantially to comply with its express warranty by taking appropriate corrective action or otherwise making [the plaintiff] whole, was reasonably found by the jury to constitute 'oppression, fraud, or malice' with a 'conscious disregard of the plaintiff's rights.' . . . A punitive damage

31

Ford relies on a series of cases in arguing its proposed "no-double-punitives" rule, all of which involved multiple causes of action grounded on *the same conduct*. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 726, 730-731 (*Fassberg*) [cross-complainant alleging presentation of false claims for payment was a violation of California False Claims Act, breach of contract and constituted intentional and negligent misrepresentation]; *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 898, 907 (*De Anza*) [action by mobile home owners seeking damages for excessive water charges]; *Clauson v Superior Court* (1998) 67 Cal.App.4th 1253, 1255 [complaint alleging two causes of action grounded on the allegation the defendants installed eavesdropping devices in plaintiff employee's office and wiretapped plaintiff's telephones]; *Turnbull & Turnbull v. ARA Transportation, Inc.* (1990) 219 Cal.App.3d 811, 814, 826-827 (*Turnbull*) [punitive damages and civil penalty awarded for single cause of action under the Unfair Practices Act alleging defendant sold its bus transportation services below the cost of providing the services with the purpose of injuring competitors or destroying competition]; *Marshall v. Brown* (1983) 141 Cal.App.3d 408, 412 (*Marshall*) [plaintiff sought punitive and statutory penalties as to two causes of action, both of which were based on false statements the defendant made about the plaintiff, a former employee].)[11]

---

award was thus proper." (*Troensegaard, supra,* 175 Cal.App.3d at p. 226, italics added.) Regarding the acts underlying the civil penalty, the court wrote: "Surely, [the defendant's] refusal, after notice of the mobilehome's defective condition, to make [plaintiff] whole, *and* its concealment of the report of such condition, was substantial evidence of such 'willfulness' " under section 1794, subdivision (c). (*Troensegaard*, at p. 226, italics added.) Thus, as can be seen, the post-sale conduct in *Troensegaard* underlying the punitive damages and civil penalty was not merely "substantially" the same; it was, in fact, the same.

[11] Each of these cases held that because the punitive damages award and civil penalties were based on the same conduct, the plaintiff was required to make an election between

Here, unlike in the cases Ford relies upon, the punitive damages and statutory penalties were based on different conduct that took place at different times. The punitive damages were based on conduct underlying the fraud/CLRA causes of action and took place before the sale. The civil penalty was based on defendant's post-sale failure to comply with its Song-Beverly Act obligations to replace the vehicle or make restitution when reasonable attempts to repair had failed.

In the operative complaint, in the fraud in the inducement—concealment cause of action upon which plaintiffs prevailed, plaintiffs alleged Ford induced them to enter into the retail sales contract by concealing material information, including that "the 2005 F-250 was equipped with a defective . . . 6.0-liter Navistar diesel engine, which Ford could not repair under its express, written warranty, that the 2005 F-250 would exhibit defects that would prevent the truck from being merchantable, that the 2005 F-250 would exhibit defects that would substantially impair the use, value, or safety of the truck, and that the 2005 F-250's defects could not be repaired and eliminated under the applicable warranties." Similarly, in their cause of action based on the CLRA, plaintiffs alleged Ford made certain representations concerning the quality of the 6.0 liter Navistar diesel engine knowing of the problems with that engine, that plaintiffs relied on Ford's representations in purchasing the truck, and that, as a result, they had been injured. They asserted that Ford was guilty of oppression, fraud, or malice in connection with both of these causes of action. (§ 3294, subd. (a).)

As for the Song-Beverly Act cause of action, plaintiffs alleged the truck was delivered with serious defects and nonconformities to warranty, that the defects manifested themselves within the applicable express warranty period, that they delivered

---

the two. (*Fassberg*, *supra*, 152 Cal.App.4th at pp. 759-760; *De Anza*, *supra*, 94 Cal.App.4th at pp. 907, 912; *Clauson*, *supra*, 67 Cal.App.4th at p. 1256; *Turnbull*, *supra*, 219 Cal.App.3d at pp. 826-827; *Marshall*, *supra*, 141 Cal.App.3d at pp. 419-420.) Given our holding, no election is required here.

the truck to Ford for repair on no fewer than six occasions, that Ford refused and/or failed to adequately repair the vehicle and/or honor the warranties, that Ford failed to replace the truck or make restitution, and that Ford willfully failed to comply with their responsibility to do so under the Song-Beverly Act.

Based on the pleadings and the trial evidence, plaintiffs' fraud/CLRA claims, and the punitive damages attached to them, were necessarily based on Ford's conduct leading up to and at the time of plaintiffs' purchase of the truck. The theory of liability was that Ford concealed the known substantial defects of the 6.0 liter Navistar diesel engine from them. Plaintiffs' resulting harm stemmed from that deception. (See *Santana, supra*, 56 Cal.App.5th at p. 350.)

Plaintiffs' Song-Beverly Act cause of action, and the civil penalty imposed, were necessarily based exclusively on post-sale conduct after plaintiff notified defendant of problems he was having with the truck, three years after the purchase. To recover on that cause of action, and to warrant the imposition of the civil penalty, plaintiffs had to prove that Ford failed to repair the truck after making reasonable efforts to do so and thereafter willfully failed to comply with its obligation to replace the truck or pay plaintiffs restitution. Plaintiffs' harm stemmed from the failure to honor the warranty and subsequent failure to replace the vehicle or pay restitution. (See *Santana*, *supra*, 56 Cal.App.5th at p. 350.)

Ford contends that courts have prohibited awards of both punitive damages and civil penalties in the same cause of action unless "expressly authorized" by the Legislature. For this proposition, Ford cites *Los Angeles County Metropolitan Transportation Authority v. Superior Court* (2004) 123 Cal.App.4th 261 (*Los Angeles County Metro.*), which involved the Unruh Civil Rights Act (§ 51 et seq.), a statutory scheme that expressly allows for both punitive damages and civil penalties for the same conduct. (§ 52, subd. (b)(1), (2).) However, nowhere in the opinion does the court say punitive damages and civil penalties are not permitted when different conduct underlies

34

each award or that the allowance of both awards must be expressly authorized by statute.[12]

Ford appears to rely on *Los Angeles County Metro., supra*, 123 Cal.App.4th 261, primarily because of the court's reference to the term "cause of action." That court stated: "[W]here the social objectives pursued by two categories of damages sought in *one cause of action* are the same, an award for both would create a double recovery," which is prohibited. (*Id.* at p. 268, italics added.) Ford then asserts that a cause of action in California is identified under the primary right doctrine: "The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced." (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798 (*Boeken*).) Thus, according to Ford's reasoning, the punitive damages award and the Song-Beverly Act penalty here both addressed plaintiffs' primary right to a working truck in exchange for their payment, "a right they simply alleged was violated in different ways" and thus an award for both is prohibited.

Our high court has explained the primary right theory. "The primary right theory is a theory of code pleading that has long been followed in California. It provides that a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of

---

[12] We note, however, that both the CLRA and the Song-Beverly Act state the remedies available for violations are nonexclusive. In pertinent part, the CLRA provides: "The provisions of this title are not exclusive. The remedies provided herein for violation of any section of this title or for conduct proscribed by any section of this title shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other law." (§ 1752.) The Song-Beverly Act provides in pertinent part: "The remedies provided by this chapter are cumulative and shall not be construed as restricting any remedy that is otherwise available." (§ 1790.4.)

action.  [Citation.]  A pleading that states the violation of one primary right in two causes of action contravenes the rule against 'splitting' a cause of action.  [Citation.]  [¶]  As far as its content is concerned, *the primary right is simply the plaintiff's right to be free from the particular injury suffered*.  [Citation.]  It must therefore be distinguished from the legal theory on which liability for that injury is premised:  'Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.' "  (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681-682 (*Crowley*), original italics omitted, italics added.)

Ford's reliance on primary right theory here is misplaced.  In its explication of the primary right theory, our high court in *Crawley* was careful to point out the following: "The primary right theory has a fairly narrow field of application.  It is invoked most often when a plaintiff attempts to divide a primary right and enforce it in two suits." (*Crawley*, *supra*, 8 Cal.4th at p. 682.)  The narrow application of primary right theory is illustrated in the cases Ford relies upon in advancing its primary right argument, all of which apply the theory in the narrow context identified by the court in *Crawley*. (*Boeken, supra,* 48 Cal.4th at p. 798 ["*for purposes of applying the doctrine of res judicata*, the phrase 'cause of action' has a more precise meaning" than counts which state the same cause of action according to different legal theories (italics added)]; *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 904 [concluding that, based on the application of the primary right theory, a second lawsuit was based on the same cause of action as the first and therefore barred by res judicata]; *In re Marriage of Garcia* (2017) 13 Cal.App.5th 1334, 1345 ["when a court applies the doctrine of claim preclusion, 'cause of action' has a specific meaning—namely, 'the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced' "]; *Balasubramanian v. San Diego Community College Dist.*, (2000) 80 Cal.App.4th 977, 991 ["For purposes of res judicata, California applies the primary right theory"].)

Moreover, not only has our high court said the primary right theory has a "narrow field of application," but it was also careful to note that "[t]he primary right must also be distinguished from the remedy sought: 'The violation of one primary right constitutes a single cause of action, though *it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other*." (*Crowley*, *supra*, 8 Cal.4th at p. 682, original italics omitted, italics added.) Thus, "[m]ultiple remedies may be available to vindicate a single primary right." (*People ex rel. Feuer v. Superior Court (Cahuenga's the Spot)* (2015) 234 Cal.App.4th 1360, 1378 [noting that our high court in *Crowley* "has confirmed the distinction between primary rights and the remedies available to vindicate those rights"].)

Primary right theory simply does not help Ford here. For purposes of avoiding double punishment, what is at issue is the conduct underlying the punitive damages award and the conduct underlying the civil penalties—here, pre-sale fraudulent inducement and the post-sale noncompliance with the Song-Beverly Act.

Ford asserts that the trial court's conclusion that the punitive damages and the Song-Beverly Act civil penalty addressed " 'separate and stand-alone conduct,' " "defies the realities of how the [plaintiffs] presented and argued their case for punitive damages." As Ford maintains, plaintiffs' expert Micale provided extensive testimony concerning internal communications at Ford. In this regard, Ford asserts on appeal that plaintiffs "convinced the superior court that Micale could testify about these documents precisely because their theory was that Ford's purported fraud continued after October 2004." But in the trial court, Ford pointed out that counsel for plaintiffs asserted that the evidence was relevant because "there is a *fraud in the performance* claim in this case . . . which alleges that Ford and its dealerships—[its] authorized repair facilities, [its] agents, failed to honestly represent what was going on with the engine every time [plaintiff] brought his vehicle in for repair." (Italics added.)

37

Ford's trial counsel was correct. As counsel noted in the trial court, plaintiffs' argument advocating for the admissibility of the corporate communications evidence pertained to their fourth cause of action, fraud in the performance of a contract—intentional misrepresentation, a separate claim concerning alleged post-sale fraudulent misconduct. In closing argument at phase 1, plaintiffs' attorney stated in connection with that claim: "And so and then the purchase is on . . . October 21st, 2004. But the fraud continues because, remember, *we also have a continuing fraud claim* so not only were they misled and not only was material information concealed to them before they bought the truck but once they had the truck every time they would bring it in Ford would advise them it was fixed when Ford acting through its agent knew there is no way that our techs could fix this because we know we can't fix it." However, as Ford has noted in its appellate briefing, the jury found in favor of Ford on the fourth cause of action. Consequently, the punitive damages later awarded by the jury necessarily related to Ford's pre-sale fraudulent inducement.

Ford also argues that "a defendant's conduct is 'substantially the same' when it is part of a 'unified course of conduct,' " "even when multiple and distinct acts, giving rise to claims under different legal theories, are involved." And because the "facts" developed from the evidence of its corporate communications overlap to show reprehensibility for punitive damages and willfulness for the Song-Beverly Act violation, both awards therefore address substantially the same conduct, or a unified course of conduct, and therefore an award of punitive damages and a Song-Beverly Act civil penalty amount to Ford being punished twice for the same conduct. We do not agree.

We have already rejected Ford's assertion that the underlying conduct need only be "substantially" the same to prohibit the recovery of both punitive damages and civil penalties; rather, the recovery of both punitive damages and civil penalties is prohibited when the underlying conduct for both remedies *is the same conduct, i.e., identical conduct*. And as we have said, the punitive damages award based on fraud and violation

of the CLRA were based on Ford's pre-sale fraudulent conduct leading up to and culminating in the sale, where Ford concealed problems relating to the defective 6.0 liter Navistar diesel engine. The Song-Beverly Act civil penalty related to Ford's willful post-sale conduct in failing to promptly replace the truck after a reasonable number of repair attempts or make restitution to plaintiffs.

We also note that the timing of the communications does not lend any support to Ford's position that there was an overlap between the fraud/CLRA and Song-Beverly Act causes of action. Two of the corporate communications in the record and discussed by Micale were written before plaintiffs purchased the truck. The others were written before plaintiff brought the vehicle in for its first repair. Thus, all the communications took place before Ford had any obligations under the Song-Beverly Act.[13] To be sure, the corporate communications were probative of Ford's culpability for its pre-sale conduct, the level of reprehensibility of that conduct, and the amount of punitive damages to be imposed. But the fact some of those communications may have also been probative of the willfulness of Ford's Song-Beverly Act non-compliance does not bar plaintiffs from both an award of punitive damages and civil penalties. (See *Santana*, *supra*, 56 Cal.App.5th at p. 350 ["arguing that the causes of action stem from different sorts of harm is a different matter than whether the causes of action share a common set of facts"].) Again, punitive damages punished Ford for oppression, fraud, or malice related to its pre-sale fraud and concealment. It separately received a penalty for willfully failing to comply with its Song-Beverly Act obligations — a penalty that was based on conduct that took place after the conduct underlying the pre-sale fraudulent concealment. That the corporate communications were evidence providing proof of considerations pertinent to punitive damages and also willfulness for the civil penalty is of no moment.

---

[13] We note that Ford's obligation to replace the vehicle or make restitution did not ripen until reasonable attempts were made to repair it. (§ 1793.2, subd. (d)(2).)

Ford appears to assert that plaintiff effectively combined the conduct underlying the fraud/CRLA cause of action and the Song-Beverly Act cause of action by arguing Ford engaged in a pattern and practice of misconduct and thus the two awards were based on substantially the same conduct. But plaintiffs are not prohibited from receiving both an award for punitive damages based on pre-sale fraudulent inducement and a post-sale Song-Beverly Act penalty based on willful noncompliance because they argued pattern and practice in the trial court. "A pattern or practice of wrongful conduct is often introduced as evidence of malice or oppression to justify a punitive damage award." (*George F. Hillenbrand, Inc. v. Insurance Co. of North America* (2002) 104 Cal.App.4th 784, 820-821.) Thus, whether Ford's conduct involved a pattern and practice of misconduct as well as other factors, such as how reprehensible Ford's conduct was and whether Ford disregarded the safety of others were all express considerations for the jury to weigh in deciding the amount of punitive damages. (CACI No. 3942.)[14] And the amount of punitive damages is not limited to consideration of a pattern and practice of misconduct pre-sale. The jury could consider a pattern or practice that continued beyond the date of the sale.[15]

_____

[14] The jury was appropriately instructed it could consider pattern and practice, among other factors, in deciding the amount of punitive damages: "If you decide to award punitive damages, you should consider all of the following factors in determining the amount: [¶] *How reprehensible was Ford*[*'s*] . . . *conduct.* In deciding how reprehensible Ford['s] . . . conduct was you may consider among other factors whether the conduct caused physical harm, *whether Ford disregarded the health or safety of others*, whether [plaintiffs] were financially weak or vulnerable and whether Ford . . . knew they were financially weak or vulnerable and took advantage of them, *whether Ford*[*'s*] . . . *conduct involved a pattern or practice and whether Ford . . . acted with trickery or deceit.*" (CACI No. 3942, as given, italics added.)

[15] We also note that, unlike punitive damages, the Song-Beverly Act penalty for willful noncompliance does not require a showing of moral blameworthiness, malice, or a wrong toward the other party. (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 181 ["[m]oral blameworthiness is not a necessary element of willful

Moreover, whether Ford engaged in an ongoing pattern or practice of misconduct pertinent to the amount of punitive damages award does not become an impermissible consideration by virtue of the fact that plaintiffs were *also* separately alleging, and attempting to establish, that Ford willfully failed to comply with the requirements of the Song-Beverly Act.  Nor does the proper consideration of whether Ford engaged in such a pattern or practice, including pre- and post-sale conduct, lead to the conclusion that the fraud/CLRA claims and the Song-Beverly Act claim were based on the same conduct. Plaintiffs did not argue to the jury that the failure to comply with the Song-Beverly Act obligations to replace the vehicle or make restitution supported the punitive damages award.[16]  In fact, in phase 2,  plaintiffs' attorney briefly discussed the Song-Beverly Act, noting, "[y]ou can be an honest manufacturer and still have Song-Beverly issues, a customer came in multiple times, there were defects, you didn't fix them."  Counsel then stated that the Song-Beverly Act and its civil penalties were "totally separate."

Ford simply cannot escape liability for both awards by virtue of the fact that it engaged in a pattern or practice of deceitful misconduct throughout the course of the discrete events and conduct involved here.

We conclude that punitive damages and the Song-Beverly Act civil penalty were both properly awarded to plaintiffs.

---

conduct under section 1794(c)"]; *Ibrahim v. Ford Motor Co.*  (1989) 214 Cal.App.3d 878, 894 [" 'In civil cases, the word "willful," as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally.  It amounts to nothing more than this:  That the person knows what he is doing, intends to do what he is doing, and is a free agent' "].)

[16] During the instruction conference, plaintiffs' counsel made clear they were not going to argue to the jury that punitive damages could be based on the Song-Beverly Act violation.  Counsel stated, "there is no indication on the verdict form or in any of the jury instructions that we are seeking punitive damages for a violation of 1793.2. . . .  We are not trying to get punitive damages for Song-Beverly Act violation."

41

### III. Award of Attorney Fees

Ford asserts that the trial court's attorney fee award "falls with the judgment." (Capitalization omitted.)  (See *Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 107, quoting, parenthetically, *Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 ["an order awarding attorney fees 'falls with a reversal of the judgment on which it is based' "].)  According to Ford, because the judgment must be reversed, the trial court's award of attorney fees falls with the judgment and must also be reversed.  Ford makes no other argument concerning the attorney fee award.  Because we affirm the judgment, we will leave the award of attorney fees undisturbed.

\* \* \* \* \*

## DISPOSITION

The judgment is affirmed.  Plaintiffs' cross-appeal is dismissed as moot.[17]

Plaintiffs shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/s/
MURRAY, J.*

We concur:

/s/
RENNER, Acting P. J.

/s/
KRAUSE, J.

---

[17] Plaintiffs' request for judicial notice related to their cross-appeal is also moot and is denied on that basis.

*  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.